UNITED STATES of America,
Plaintiff-Appellee,

v.

Louis HAJAL et al.,
Defendants-Appellants.

Nos. 75–2522—75–2524.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 18, 1976.

Decided March 28, 1977.

Rehearing and Rehearing En Banc Denied
in Nos. 75–2524 May 6, 1977, 75–2522
May 12, 1977 and 75–2523 July 11, 1977.

Phillip A. Gillis, Gillis & LaRose, Detroit, Mich., for defendant-appellant in No. 75–2522.

Philip Van Dam, U. S. Atty., Detroit, Mich., Kirby W. Patterson, Dept. of Justice, Crim. Div., Jerome M. Feit, Washington, D. C., for plaintiff-appellee.

Richard Durant, Durant & Card, Detroit, Mich. (Court-appointed CJA), for defendant-appellant in No. 75–2523.

Nicholas Smith, Smith, Mitoff & Williams, Southfield, Mich. (Court-appointed CJA), for defendant-appellant in No. 75–2524.

Before EDWARDS, McCREE and LIVELY, Circuit Judges.

EDWARDS, Circuit Judge.

These are the consolidated appeals of four persons who have been convicted on a severed count charging conspiracy to violate the federal drug laws, in violation of 21 U.S.C. §§ 841(a)(1), 812(c), and 846 (1970). The size and scope of the conspiracy charged by the government is obvious from the indictment, the first count of which we print in full hereafter:

### "INDICTMENT

The Grand Jury charges:

### COUNT ONE

From on or about April, 1970, and continuously thereafter, up to and including the 10th day of May, 1972, in the Eastern District of Michigan, and elsewhere, WILLIAM DENNIS "Bill" SCHEBERGEN, JOSEPH EDWARD "Ed" GUNNINGHAM, JAMES R. LeBLANC, Esquire, JAMES H. VALDEZ, [sic] JOSE "Pepe" MIGUEL MUNOZ–INFIESTA, ALFREDO "Freddie" SALAZAR, OSCAR CARILLO, NORMAN "Norm" GLICKMAN, CHARLES "Chuck" "Flyboy" REES, ROBERT RAINES, RONALD FRANCIS "Ron" KURANTY, ROBERT LAWRENCE "Bob" GRAHAM, HYLAND CHARLES "HyFye" FYE, GREGORY KIRK "Greg" WES-

TON, FRANK LEWIS BANTLE, LOUIE HAJAL, JACK JOHN ALFANO, JR., JAMES GEORGE SADAK, DIANE MARGARET BERTOLO, JOZEF "Joe" KOLBUCH, PATRICIA KAY "Pattie" RASICO, and ANTHONY JOHN TEDESCO, the defendants herein, willfully and knowingly did combine, conspire, confederate and agree together, with each other, and with divers other persons whose names are to the Grand Jury unknown, to knowingly and intentionally manufacture and distribute and possess with intent to manufacture and distribute divers quantites [sic] of heroin, a schedule I narcotic drug controlled substance, cocaine, a schedule II narcotic drug controlled substance, marihuana, a schedule I controlled substance, lysergic acid diethylamide, a schedule I controlled substance, mescaline, a schedule I controlled substance, amphetamine, a schedule III controlled substance, and other controlled substances, described in Section 812(c), Title 21, United States Code, in violation of Section 841(a)(1), Title 21, United States Code.

2. Among the means by which the defendants would carry out the aforesaid conspiracy, were the following:

A. It was a part of said conspiracy that the defendants and co-conspirators WILLIAM DENNIS "Bill" SCHEBERGEN, JOSEPH EDWARD "Ed" GUNNINGHAM and JAMES R. LeBLANC, Esquire, would organize, supervise, manage, and finance a heroin, cocaine, marihuana, L.S.D., Mescaline, amphetamine, and other controlled substance manufacturing and distributing business from the Eastern District of Michigan.

B. It was a part of said conspiracy that the defendants and co-conspirators JAMES H. VALDEZ, JOSE "Pepe" MIGUEL MUNOZ–INFIESTA, ALFREDO "Freddie" SALAZAR, and OSCAR CARILLO would distribute and facilitate the distribution of heroin, cocaine, and marihuana from Peru, Mexico and other countries outside the Customs territory of the United States into the United States and from Texas, Florida, and California, to the Eastern District of Michigan.

C. It was further a part of said conspiracy that the defendants and co-conspirators NORMAN "Norm" GLICKMAN, CHARLES "Chuck" "Flyboy" REES, and ROBERT RAINES, would deliver funds used in purchasing heroin, cocaine, marihuana and other controlled substances, would transport other co-conspirators to different geographic locations to negotiate the distribution of heroin, cocaine, marihuana, and other controlled substances, by use of aircraft.

D. It was further a part of said conspiracy that the defendants and co-conspirators RONALD FRANCIS "Ron" KURANTY, ROBERT LAWRENCE "Bob" GRAHAM, HYLAND CHARLES "HyFye" FYE, GREGORY KIRK "Greg" WESTON, FRANK LEWIS BANTLE, and LOUIE HAJAL would act as wholesale distributors and would manufacture, distribute and possess with intent to manufacture and distribute the heroin, cocaine, marihuana, and other controlled substances caused to be distributed into the United States Customs territory from Peru, Mexico, and other countries outside the Customs territory of the United States and caused to be distributed from Florida, Texas, and California, to the Eastern District of Michigan, by WILLIAM DENNIS "Bill" SCHEBERGEN, JOSEPH EDWARD "Ed" GUNNINGHAM, and JAMES R. LeBLANC.

E. It was further a part of said conspiracy that the defendant and co-conspirator RONALD FRANCIS "Ron" KURANTY would obtain cocaine and heroin from Jamaica and Miami, Florida for distribution in the Eastern District of Michigan.

F. It was further a part of said conspiracy that the defendant and co-conspirator FRANK LEWIS BANTLE would procure vehicles for transportation of controlled substances and houses to conceal controlled substances and to house the conspirators negotiating for those controlled substances.

G. It was further a part of said conspiracy that the defendants and co-conspirators JACK JOHN ALFANO, JR., JAMES GEORGE SADAK, DIANE MARGARET BERTOLO, JOZEF "Joe" KOLBUCH, PATRICIA KAY "Pattie" RASICO, and ANTHONY JOHN TEDESCO would act as retail distributors of controlled substances in the Eastern District of Michigan.

### OVERT ACTS

In pursuance of the said conspiracy and to effect the objects thereof, in the Eastern District of Michigan, and elsewhere, the defendants committed the following overt acts, among others:

1. On or about September and October, 1971, the defendants WILLIAM DENNIS "Bill" SCHEBERGEN, JOSEPH EDWARD "Ed" GUNNINGHAM, JAMES R. LeBLANC, Esquire, NORMAN "Norm" GLICKMAN, and CHARLES "Chuck" "Flyboy" REES, traveled to Lima, Peru.

2. On or about January 26, 1972, WILLIAM DENNIS "Bill" SCHEBERGEN, JOSEPH EDWARD "Ed" GUNNINGHAM, JAMES H. VALDEZ, and NORMAN "Norm" GLICKMAN, had a meeting in El Paso, Texas.

3. On or about April 6, 1972, at approximately 1:00 A.M., the defendants JOSEPH EDWARD "Ed" GUNNINGHAM and JAMES H. VALDEZ had a telephone conversation.

4. On or about April 7, 1972, the defendants WILLIAM DENNIS "Bill" SCHEBERGEN and JOSEPH EDWARD "Ed" GUNNINGHAM traveled from Detroit, Michigan to Pharr, Texas.

5. On or about April 11, 1972, at approximately 1:16 A.M., the defendants HYLAND CHARLES "HyFye" FYE, and GREGORY KIRK "Greg" WESTON had a telephone conversation.

6. On or about April 17, 1972, at approximately 12:30 P.M., the defendants RONALD FRANCIS "Ron" KURANTY and JOZEF "Joe" KOLBUCH had a telephone conversation.

7. On or about April 21, 1972, at approximately 10:56 P.M., the defendant RONALD FRANCIS "Ron" KURANTY had a telephone conversation with "Raymond", who is not further known to the Grand Jury.

8. On or about May 2, 1972, the defendants NORMAN "Norm" GLICKMAN, ALFREDO "Freddie" SALAZAR, and ROBERT RAINES, traveled to Harlingen Industrial Airport, Harlingen, Texas.

9. On or about May 2, 1972, the defendants WILLIAM DENNIS "Bill" SCHEBERGEN, JOSEPH EDWARD "Ed" GUNNINGHAM, and JOSE "Pepe" MIGUEL MUNOZ–INFIESTA, had a meeting in Detroit, Michigan.

All the foregoing in violation of Title 21, United States Code, Section 846."

No present appellant now disputes that government proofs were such as to offer overwhelming evidence of the existence of a large (and for a time successful) international conspiracy to bring a variety of illegal drugs to Detroit for ultimate street sale.

 It is clear, however, that the present appellants were not principals who were at the heart of the conspiracy charged. Indeed, they contend that they were not a part of the conspiracy at all, or in defendant Glickman's case, if there was proof that he was engaged in a conspiracy, it was an entirely different conspiracy, to possess and distribute only marihuana. They also dispute the fairness of the trial, arguing that the District Judge's rulings on admission of evidence and his charge to the jury contained serious and prejudicial errors which mandate reversal for new trial.

### THE GENERAL CONSPIRACY

Proofs at trial were supplied largely from two sources—coconspirators who turned state's evidence and a multitude of tapes and transcripts resulting . from court-ordered wiretaps.[1]

---

1. We, of course, recite the facts from the point of view favorable to the government's case, which the jury verdicts indicate that the jury believed. *United States v. Woods,* 544 F.2d 242, 264 (6th Cir. 1976).

Defendant Gunningham, who obviously was the key figure in this conspiracy, pled guilty before this trial took place. He was sentenced to 10 years, and subsequently appealed. This court has already entered a summary order affirming Gunningham's conviction.

The first evidence of the conspiracy concerned a meeting at a bar in Detroit in (or about) the month of February 1971. Present were Gunningham, Schebergen, LeBlanc, Rees and Bantle. Thereafter Bantle went to Pharr, Texas, and purchased a house with money furnished to him by Gunningham and which house he promptly deeded to Gunningham. Bantle, who pled guilty and testified for the government, gave evidence concerning his role as a courier carrying money between Gunningham in Detroit and a man named Salazar in Texas. At the house in Pharr, Bantle testified that he saw suitcases of marijuana. He saw Rees, Weston and Fye at the Pharr house. He also saw Glickman at an airport near Pharr and flew from Texas to Detroit with Rees, who had a plane load of marijuana.

Bantle also testified to being at the Detroit headquarters of the drug ring on Keating Street near Seven Mile Road and there seeing similar suitcases of marijuana. He also testified that he saw marijuana and heroin being cut at the Keating Street headquarters operated by Gunningham.

Still another coconspirator who testified for the government was Sadak. Sadak worked for Gunningham at the Keating Street headquarters. He testified to seeing Gunningham, Schebergen and Weston cutting heroin in one room at Keating and cutting cocaine in another. He also testified to the fact that all kinds of drugs were sold from the Keating Street house, including cocaine, heroin, marijuana, LSD and barbiturates. Sadak's work particularly involved distribution of Mexican marijuana. He testified that the Gunningham operation handled very large quantities of marijuana.

Another coconspirator who turned state's evidence was Patricia Rasico, who at the times concerned was living with Greg Weston, another of Gunningham's employees in drug distribution. Rasico also testified to seeing large quantities of heroin, cocaine and marijuana at the Keating Street headquarters. Among those she identified was Rees, who was introduced to her as Gunningham's pilot.

## THE MEXICAN CONNECTION

The evidence leaves no doubt that the large amounts of marijuana which were sold in Detroit from Gunningham's Keating Street headquarters came from Mexico. The marijuana was taken to the house at Pharr, Texas, which Gunningham had bought, and subsequently was flown into Detroit. Two pilots, Rees and Glickman, worked for Gunningham. They owned their own planes, but when Rees was in jail in Peru, Glickman flew Rees' plane. Glickman was identified as being at the house in Pharr and at the Keating Street house. Rees was identified as being at the house in Pharr. Glickman also chauffeured Gunningham in Texas. When he was arrested he had $25,000 in cash on his person and said he worked for Gunningham. There was testimony that Gunningham referred to Rees as his employee. The evidence was such as to allow the jury to view Glickman and Rees as the major couriers of drugs and money for the conspiracy. Raines, himself a pilot who flew some Texas flights for the conspiracy, gave a particularly vivid account of accompanying Glickman on a flight to Pharr to pick up suitcases of marijuana and bring them back to Detroit. Raines testified that Rees had a key to the Pharr house and that Rees said he was flying for Gunningham.

## THE FLORIDA CONNECTION

Ron Kuranty was identified by direct evidence of coconspirators and tapes of phone calls as a major Detroit distributor of drugs

for the Gunningham operation. He also had a source in Florida for cocaine which he supplied to Gunningham. Sadak testified that Kuranty told him about his (Kuranty's) May 1972 trip to Florida with Glickman flying him, after which Kuranty called Schebergen to tell him he had cocaine for sale.

## THE PERUVIAN CONNECTION

Gunningham's direct source of cocaine was Peru and he boasted repeatedly that his Peruvian cocaine was better than Kuranty's cocaine.

The most direct description of the Peru connection is contained in the Sadak testimony. In January of 1972, Rees had been jailed in Peru and Valdes, a Los Angeles bailbondsman and purported Mexican lawyer, was contacted by Gunningham. He estimated that his total fee for freeing Rees (and checking on related charges pending against Gunningham) would be $25,000. Valdes agreed to meet with Gunningham in El Paso. There he was met by Gunningham, Schebergen and Glickman. In negotiations with Gunningham, Valdes agreed to go to Lima and received $5,000 of his fee. After several calls from Valdes demanding more money, Gunningham sent Sadak to Lima with $10,000 in $100 bills in a money belt. When Sadak got in touch with Valdes in Lima and paid over the $10,000, he also asked him about some cocaine for his own use and Valdes told him he could get some in "the mountains." When Sadak was about to return to Detroit, Valdes gave him a tape cassette for Gunningham which Sadak was leery of carrying back. Valdes told him that it could not get him into trouble and played part of it for him. Subsequently Sadak testified that he and Kuranty played the entire cassette before turning it over to Gunningham. The tape, according to Sadak, described a deal for purchase of 15 objects variously referred to as "transistors" or "translators" at a price per unit of $5,000 in Peru, $6,500 in Bolivia, and $8,500 in Northwest Mexico. The jury could have concluded that the unit under discussion was, as Valdes testified, a device for rebroadcasting television pictures. Or it could, as it obviously did, have accepted Sadak's testimony that the word used on the tape was a euphemism (not Sadak's term) for a kilo of cocaine.

## WIRE INTERCEPTION EVIDENCE

Thus far the facts have been stated chiefly from the testimony of coconspirators who had pled guilty. Much of the government's case, however, consisted of transcripts of telephonic interceptions authorized by court-ordered warrants. Over 2,000 calls were thus intercepted and many were introduced. Most of these calls while probative of the existence and scope of the conspiracy, pertained directly to principals who were closer to the heart of the operation than the remaining defendants.

There were, however, telephonic interceptions of important conversations of three of the appellants, Hajal, Valdes and Glickman. In the instance of these three appellants, the conversations admitted in evidence were in themselves sufficient to allow the jury to find that appellants Hajal, Valdes and Glickman were knowing participants in the general conspiracy described above. The most relevant of these conversations are set out in Appendices A, B and C attached to this opinion.[2] Wire interception number three on the telephone at the Pharr, Texas, house provided two conversations between Glickman and Salazar (both in Texas) which the jury could have viewed as Salazar's inquiry as to whether Gunningham wanted to buy heroin and Glickman's day-later response that he did. As to appellant Rees, there was ample testimony from which the jury could have concluded that he was working for Gunningham as both courier and pilot from the beginning of the conspiracy until interrupted by his stay in the Peruvian jail.

We therefore hold that this record contains ample evidence from which the jury in this case could properly find each of the above-named appellants guilty as charged beyond reasonable doubt.

2. No appellate issue is advanced concerning the admissibility of this wiretap evidence.

OTHER APPELLATE ISSUES

In addition to disputing the adequacy of evidence linking them to the conspiracy, defendants Hajal, Glickman and Rees also claim reversible error in the fact that at one point the District Judge admitted hearsay evidence saying that it might be used to establish a defendant's participation in the conspiracy. The evidence thus admitted pertained to appellant Hajal. Witness Sadak was allowed to testify to the fact that he heard Gunningham and Schebergen talking about Hajal, and the fact that Hajal owed Gunningham $7,500, and Gunningham, as a result, would not supply him with any more drugs.

We have no doubt, as the District Judge himself recognized before the trial was concluded, that the ruling objected to was error. The latest of many Supreme Court pronouncements upon this issue is as follows:

> The hearsay rule does not automatically bar all out-of-court statements by a defendant in a criminal case. Declarations by one defendant may also be admissible against other defendants upon a sufficient showing, by independent evidence, of a conspiracy among one or more other defendants and the declarant and if the declarations at issue were in furtherance of that conspiracy. The same is true of declarations of coconspirators who are not defendants in the case on trial. *Dutton v. Evans*, 400 U.S. 74, 81, 91 S.Ct. 210, 215, 27 L.Ed.2d 213 (1970). *United States v. Nixon*, 418 U.S. 683, 701, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974). (Footnotes omitted.)

In our instant case the District Judge repeatedly charged the jury as to the necessity that there be evidence which convinced the jury of the existence of the conspiracy charged in the indictment and evidence which convinced them that a defendant had knowingly and purposefully joined the conspiracy before any hearsay evidence could be considered in weighing the guilt of that particular defendant.

Three such charges—all given before the episode with which we now deal—are printed in Appendix D to this opinion.

At the end of the trial, counsel for Hajal made a motion to dismiss, based upon the hearsay objection set out above. The District Judge thereupon ruled out of the presence of the jury.

First of all, last night at the close of the case I invited Mr. Gillis and Government counsel into chambers, and in their presence and mine, the testimony of Mr. Sadak with regard to the claimed hearsay statements that the Court permitted Mr. Sadak to testify to in conversations that he had with Mr. Gunningham and Mr. Kuranty were alluded to.

The record will note that Mr. Gillis indicated that I had made a ruling at the time which was inconsistent with the instructions on the law that I was giving to the jury in the proposed instructions that I had prepared.

Consequently, I had that testimony read back, as I say. I think that the record did not, should not only meet Mr. Gillis' objection, which it does, but my response to the objection which has not been on the record heretofore. At the time that I permitted the evidence to come in from Mr. Sadak there was already testimony in the record through the telephone calls that had been introduced by the Government against Mr. Sadak—

MR. KAUFMAN: Mr. Hajal.

THE COURT: —against Mr. Hajal, thank you.

And there was also other testimony at that juncture to show two things: and that is proof of the conspiracy and proof that Mr. Hajal joined the conspiracy. With that proof already in the record, I am convinced that the order of proof permitted me to allow hearsay statements in thereafter for any purpose against Mr. Hajal.

And I do not believe, as Mr. Gillis urged, that I had to give at that juncture a limited statement as to how the jury could use the hearsay statements of the witness Sadak.

I do believe that my rulings were correct but at one point in the record I think I gave the wrong reason for the ruling. It came about, as I recall it, in this way: Having announced the general rule with regard to the admissions of and statements of the coconspirators and without indicating that there had already been testimony from which the jury could link Mr. LeBlanc—Mr. Hajal to the conspiracy, I said to Mr. Gillis, "Let's pass that point, and then incorrectly stated a proposition of law."

I want the record to note that while my rulings were correct, my reason at the time for giving the ruling was not. I do not believe, on reflection, that it would be either wise or proper for me to allude to this now in the instructions to the jury, since I believe the admission of that testimony was proper. And the record will so note, but it also notes Mr. Gillis' objection.

He thereupon repeated in his instructions to the jury still another admonition that hearsay could be considered only if there was direct evidence that each defendant had "knowingly and purposely entered the conspiracy."

We agree with the District Judge. The evidence concerning Hajal which had been admitted was admissible—subject to the admonitions already given and repeated in the charge. We also agree, however, that in saying it could be used to connect Hajal with the conspiracy, the District Judge had misspoken and was in error.

In the total context of this three and one-half month trial, however, we believe that the error must be weighed against the standard of Rule 52(a) of the Federal Rules of Criminal Procedure which says:

> **Rule 52. Harmless error and plain error.—(a) Harmless error.—**Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

Fed.R.Crim.P. 52(a).

Thus weighed, we find these factors. First, proper rulings on the use of hearsay had already been given before the erroneous statement. Second, the material admitted as to Hajal was admissible under standard conspiracy law. Third, the facts shown in the material admitted were also proved in direct evidence in conversations quoted in Appendix A between Gunningham and Hajal. And, finally, the jury was given still another instruction on the proper use of hearsay in the Judge's charge. We hold that the District Judge's misstatement was harmless error as to Hajal and the codefendants.

We have also reviewed the District Judge's charge with care in relation to the additional claims of error therein asserted in the briefs of Hajal, Glickman and Rees. Taken as a whole, we believe the charge was a fair and accurate statement of conspiracy law. We find no reversible error therein.

## INDIVIDUAL ISSUES

Appellant Hajal claims that the conspiracy for which he was convicted was one not charged in the indictment. Actually, the first paragraph of the indictment and paragraph 2(d) specifically charge the participation of Hajal as a distributor of drugs in Detroit, as to which we have previously found ample evidence to support the jury verdict.[3]

Hajal also asserts that his conviction should be vacated because the Attorney General failed in timely fashion to republish the schedule of controlled substances. The simple answer to this argument is that we do not read the Comprehensive Drug Abuse Prevention and Control Act of 1970 § 202, 21 U.S.C. § 812 (1970), as terminating the published schedules of drugs on any date certain "unless and until amended pursuant to section 811 of this title."[4] We regard

---

3. *See United States v. Woods*, 544 F.2d 242, 265, 266–67 (6th Cir. 1976).

4. **§ 812. Schedules of controlled substances— Establishment**
 (a) There are established five schedules of controlled substances, to be known as sched-

the language pertaining to updating and republishing as directory only. We will leave for a case presenting the issue any argument as to whether a *nunc pro tunc* schedule amendment which made criminal the possession or sale of a previously legal drug would violate the constitutional prohibition against *ex post facto* laws. Here, clearly, heroin, which evidence allowed the jury to find was used, possessed and sold by Hajal, had been an illegal drug all the while. *See generally United States v. Grummel*, 542 F.2d 789 (9th Cir. 1976); *United States v. Mundt*, 508 F.2d 904 (10th Cir. 1974), *cert. denied*, 421 U.S. 949, 95 S.Ct. 1682, 44 L.Ed.2d 103 (1975); *United States v. Nocar*, 497 F.2d 719, 722–23 (7th Cir.), *cert. denied*, 419 U.S. 1038, 95 S.Ct. 526, 42 L.Ed.2d 315 (1974).

■ Appellant Glickman relies upon a number of issues discussed and ruled upon above. He also claims prejudicial error in the admission at trial of $29,000 found in a suitcase which he had just loaded into a plane belonging to appellant Rees. Appellant Glickman and appellant Rees were specifically named in paragraph 2(c) of the indictment, which reads:

2. Among the means by which the defendants would carry out the aforesaid conspiracy, were the following:

\* \* \* \* \* \*

C. It was further a part of said conspiracy that the defendants and co-conspirators NORMAN "Norm" GLICKMAN, CHARLES "Chuck" "Flyboy" REES, and ROBERT RAINES, would deliver funds used in purchasing heroin, cocaine, marihuana and other controlled substances, would transport other co-conspirators to different geographic locations to negotiate the distribution of heroin, cocaine, marihuana, and other controlled substances, by use of aircraft.

We believe that Glickman's and Rees' roles as couriers in the transportation of money for purchase of drugs was directly involved in the criminal conspiracy and that the unusual sum of money found in the plane at the point of arrest was relevant proof for the jury's consideration.

■ Appellant Rees presents an additional individual argument not thus far dealt with. A Canadian constable was testifying about Gunningham, who after arrest jumped bail and fled to Canada. In doing so he testified that appellant Rees had been introduced to him in Canada by Gunningham as "Andy Watson." The District Judge originally admitted this evidence, even though it followed the termination of the conspiracy, because it pertained to conversation in appellant Rees' presence. Later, however, he granted a defense motion to strike this evidence, but denied a motion for a mistrial. Appellant testified that he turned himself in voluntarily. Our review of the District Judge's rulings on this issue do not demonstrate any abuse of judicial discretion or error prejudicial to appellant Rees' rights.

■ The most difficult of appellant Rees' issues pertains to the fact that information concerning Rees' incarceration in Peru came to the attention of the jury. The route by which this occurred is important.

Appellant Valdes' chief defense to the government's charges against him was that he was employed by Gunningham as a lawyer to go to Peru to represent Rees concerning the drug charges on which Rees was confined. One month after this trial began, counsel for Valdes first raised the question of Rees' being in jail in Peru by a question addressed to the government agent in

ules I, II, III, IV, and V. Such schedules shall initially consist of the substances listed in this section. The schedules established by this section shall be updated and republished on a semi-annual basis during the two-year period beginning one year after the date of enactment of this subchapter and shall be updated and republished on an annual basis thereafter.

\* \* \* \* \* \*

**Initial schedules of controlled substances**

(c) Schedules I, II, III, IV, and V shall, unless and until amended pursuant to section 811 of this title, consist of the following drugs or other substances, by whatever official name, common or usual name, chemical name, or brand name designated:

21 U.S.C. § 812(a) & (c) (1970). (Schedules omitted.)

charge on cross-examination. A hearsay objection prevented an answer. Next Valdes' counsel made it known that he intended to question Sadak about why Gunningham had sent Sadak to Peru. This promptly brought Rees' lawyer to object first on the ground of lawyer-client privilege, and then on the ground of prejudice to his client by revealing to the jury an unproven drug charge not the subject of the indictment.

The conflict of interests approached the classic. The District Judge attempted to weave his way carefully between *Scylla* and *Charybdis*. He ruled that testimony from Sadak could not invade any lawyer-client privilege and he allowed the jury to hear the following colloquy:

Q (By Mr. Smith): Mr. Sadak, do you know the purpose for your trip in March of 1972 to Peru, in March of 1972?

A Yes, I was told the purpose of my trip.

Q What was that purpose?

A The purpose of my trip was to deliver money to a Mr. James Valdes for the benefit and release of Mr. Charles Rees, who had been in trouble of some sort in Lima, Peru.

MR. DURANT: I object to that, your Honor.

THE COURT: The answer may stand.

(By Mr. Smith): Mr. Valdes, specifically—

THE COURT: Let me say to you, ladies and gentlemen, that the matter of the witness' answer with regard to Mr. Rees may not be considered by you in any way, shape or form in connection with the charge that Mr. Rees faces here. And I think that in order to make that cautionary instruction as telling as possible, I will instruct you that that part of Mr. Sadak's answer that had to do with Mr. Rees and the fact that he was in some trouble, as Mr. Sadak said, in Lima, Peru, should be stricken from your minds and not considered.

Do you understand that, ladies and gentlemen?

(All jurors answer affirmatively.)

MR. DURANT: Your Honor, in addition to that cautionary instruction, I would like to make it clear, again, that my objection goes to the point where I feel that I am entitled, in the defense of my client, to show the outcome of it and the acquittal.

THE COURT: Well, if you wish to do that on your side of the case, the door has been opened.

MR. DURANT: Thank you, your Honor.

THE COURT: But I am indicating to you, ladies and gentlemen, that that matter of whatever happened in Lima, Peru as far as Mr. Rees is concerned, cannot be taken to bear on his guilt or innocence in the trial in this case. I will have more to say about that when I give you my final instructions.

Go ahead.

Q (By Mr. Smith): In fact, Mr. Sadak, knowledge had been supplied to you that Mr. Rees was in jail?

A Yes, sir.

In both instances counsel for Rees moved for severance and mistrial and now claims reversible error in the District Judge's denial of both motions. The District Judge, however, repeatedly instructed the jury that the answers complained about should not be considered "in any way, shape or form in connection with the charge that Mr. Rees faces here." Subsequently, the District Judge allowed Rees' lawyer to establish through Rees' testimony that he had been exonerated on the Peruvian charges and released.

In time sequence, the testimony here complained about came into the record before the government had introduced rebuttal evidence designed to show that Valdes was not a Mexican attorney at all, and while appellant Valdes' defense was that his mission in Peru was as retained counsel for Rees.

It should also be noted that Rees' motion for severance and mistrial, based on the colloquy printed above, came late in this three and one-half month trial.

We measure the claims of error in this regard against two general rules of evidence now formalized in the Federal Rules of Evidence.

Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed.R.Evid. 403.

Rule 404(b) provides:

**(b) Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed.R.Evid. 404(b).

While these rules did not become effective until July 1, 1975—well after completion of this trial—we believe they serve to state preexisting law on the subject concerned.

Because of the complexity of problems of evidence presented by differing trial situations, both rules are written to recognize numbers of exceptions. And the accompanying notes emphasize the great discretion necessarily possessed by the trial judge in admission or exclusion of evidence.

In this trial Rees' right to be tried only on the charges in the indictment without being prejudiced by irrelevant charges brought by a foreign sovereign had to be weighed against Valdes' right to develop his defense that his actions were in pursuance of his duties as a lawyer and the government's theory that all of Valdes' actions in Peru were part of the international drug conspiracy in which he was charged with participation.

If these conflicts had been fully developed prior to commencement of trial on a motion to sever Rees' trial, we might have a different case. Sometimes, however, the facts complained about as prejudicial are so much a part of the res gestae of a crime as to be impossible to avoid. Thus in a very recent decision (dealing with a bank robbery committed by three inmates of the Milan Federal Correctional Institution while out of the walls on a "work release" program) this court said:

The motion to limit testimony required the district court to weigh the probative value of the evidence offered against the possible prejudice of revealing the fact that the appellants had been previously convicted of some crime. Rule 403, Fed. R.Ev. The jury is entitled to know the "setting" of a case. It cannot be expected to make its decision in a void—without knowledge of the time, place and circumstances of the acts which form the basis of the charge.

*United States v. Roberts,* 548 F.2d 665, 667 (6th Cir. 1977).

Turning now to appellant Valdes we note that counsel for him asserts prejudicial error on his behalf in the District Judge's admission of witness, and coconspirator, Sadak's understanding of the meaning of the word "translator" employed in the tape recording Valdes asked him to take from Peru to Detroit and deliver to Gunningham. We find no rule of evidence or case law precisely in point on this issue. Our review of this issue convinces us that Sadak was an "expert" in the murky recesses of the international drug traffic and that the District Judge did not abuse his discretion in allowing the jury to hear Sadak's opinion that "translators" referred to cocaine in the context of the taped message.

Appellant Valdes' second claim of reversible error is founded upon alleged improper authentication of foreign documents which the government introduced to dispute appellant Valdes' claim that he was an attorney licensed to practice in Mexico. Rule 44 of the Federal Rules of Civil Procedure is made applicable to admission of foreign official records in a criminal trial by Rule 27 of the Federal Rules of Criminal Procedure. This record indicates that the District

Judge carefully followed the present version of Rule 44 in admitting two rebuttal documents and in refusing to admit another.

Throughout the record of this case, we have noted the patient and thorough consideration given by the District Judge to every defense objection. We also have noted his many rulings in favor of exclusion of prejudicial evidence and his admonitions to the jury designed to see that they considered only the charges in the indictment.

We do not suggest that this trial was error free—but we have yet to review a perfect jury trial, let alone one of this length. As to this (and all other complaints about admission or exclusion of evidence which we have not deemed meritorious enough to discuss), we find no abuse of judicial discretion and no error prejudicial to the rights of appellants.

Finally, we have reviewed with care the District Judge's charge in this complex case. We find it balanced, coherent and, taken as a whole, just to both the prosecution and the defense.

The judgments of conviction are affirmed.

### APPENDIX A

#### Valdes

All of the taped phone calls pertaining to Valdes were obtained from Wire Interception # 1, a phone in the Keating Street house.

On April 2, 1972, at 8:48 a. m., Valdes left the following message on a tape recorder answering device (Call # 312): [PCM = Valdes and PAF = Unidentified tape operator]

PCM: Yes, Ed, would you give me a call at Lima as soon as you can, I have something important to tell you. Uh, call me at the usual number, 246928, and uh, uh, I'll wait for your call today.

PAF: OK.

On April 2, 1972, at 1:49 p.m., a phone call was made from the Keating Street phone to number 246928 in Lima. (Call # 340). In the following excerpt, Gunningham, at Keating Street is speaking to Valdes in Peru:

[PAM = Valdes and PCM(2) = Gunningham]

PAM: What's happening, brother?

PCM(2): How are ya'? I got your message.

PAM: Yes, well, we're, all ready on this end and the less we talk about it the better off we are.

PCM(2): Uh huh.

PAM: We're, uh, uh, in a, in a position to, to do it where we said way up there, no problems?

PCM(2): All the way you mean?

PAM: Huh?

PCM(2): You in a po-

PAM: No, not all the way, no.

PCM(2): Oh, the last spot that I talked to you about.

PAM: Yeh.

PCM(2): Uh huh.

PAM: That's all ready to go. It's just a matter of picking up the wheels and, uh, we're gonna have to pay, uh, uh, one more.

PCM(2): Uh huh.

PAM: But I think it's worth it.

PCM(2): Oh, for that.

PAM: Yeh. At this stage I think it is.

PCM(2): Yeh.

PAM: Because it's gonna be, uh [PCM(2): Here let me get] Kansas City if we don't.

PCM(2): Do you want me to give you this guy's name and phone number that I got this letter from?

PAM: Uhm.

PCM(2): Or do you think it'd be.

PAM: The only thing about that, I'm worried about, are you sure it came from him?

PCM(2): Huh?

PAM: Are you sure it came from him?

PCM(2): Oh, yeh. He wouldn't know the, uh, the information if it didn't, you know, what I mean, that's in the letter.

PAM: The address is available here.

PCM(2): Yes, but, uh, not from Africa.

PAM: (Inaudible) he didn't know, huh?

PCM(2): Huh? No.

PAM: There were other things he didn't know.

PCM(2): Right.

PAM: OK.

PCM(2): I mean just, just, uh, give him a phone call and tell him that you're, uh, calling for me and that, uh, uh, you'll get back with him, uh that I'm not in a position right now to, to do anything but I'm still interested.

PAM: OK, what's his, what's the number?

\* \* \* \* \* \*

PAM: So, what do you want me to do? Do you want me to, to come in or, or do you want to say yes or no on this or what?

PCM(2): No, I say yes on it. Its being all taken care of right as of now, you know, Tuesday, uh, everything is being worked out.

PAM: OK.

PCM(2): Tell him that. Everything's being.

PAM: Well, uh, how do you want us to do the exchange, what do we do?

PCM(2): Well, what I should do is probably meet you say, uh, in Mexico City.

\* \* \* \* \* \*

PAM: So that could put me in Mexico City over the weekend.

PCM(2): That sounds good.

PAM: OK, let's, let's do it then and, uh, the, the thing is you've got the tape, [Defendant's version: Keep] right.

PCM(2): Yeh.

PAM: All right. Its, its one on top of the price in, in Lima.

PCM(2): Yeh, right.

PAM: Okay?

PCM(2): Uh huh.

PAM: But I think its, its uh the best way to go. I've looked at it from all angles, that's the best way to go.

PCM(2): That would be, that's okay with me as long as the, the, that one, the whole thing is to be transacted right there, its not to be transacted in Lima.

PAM: Yeh, well, I don't know if we can do that or not. We'll, we'll uh, we'll work out the details.

PCM(2): Yeh, okay.

PAM: I doubt that.

PCM(2): Well, I hate to put up the thing before it gets to where.

PAM: I'm stayin' on top of it, don't worry about that.

PCM(2): Yeh, okay, good enough then, uh, uh, work it out as of that, you know that, as of that way and, uh, possibly, uh, uh, a few more than what was actually calculated.

PAM: All right, we'll, we'll see what we can do.

PCM(2): Okay, and uh, I'll get back with you, try to be able to meet you this coming weekend.

PAM: Allright, that'll be fine. That's, uh, be the weekend after the 7th.

PCM(2): Right.

PAM: Okay, in Mexico City.

On April 6, 1972, at 12:51 a.m., Valdes called the Keating Street house (Call # 643) and spoke to Gunningham:

[PAM = Valdes and PCM = Gunningham]

PCM: Ya' gonna be able to be down there? Saturday? Huh?

PAM: Yeh, I've got it all set up for Sunday.

PCM: For Sunday?

PAM: Yeh, cause they, can you make it Sunday?

PCM: Sure can.

PAM: OK.

PCM: And uh, where abouts?

PAM: Well, Mexico City probably or if you want me to I can travel into the States, its up to you.

PCM: Well, that's fine. That's fine.

PAM: Where would you rather be?

PCM: That's OK, right there.

PAM: OK.

PCM: But I don't know where, uh, should I get all that information from Fye where you're, uh, your phone number and all that wh', I don't know if he's got it. (background conversation: MALE: Have you got his phone number?)

PAM: Well, I'll, I'll be at the same, you tell Mary that I'll be at the same hotel that I'm always in when I'm in Mexico City.

\* \* \* \* \* \*

PCM: Uh huh. And, uh, that other thing is all taken care of, too, as far as the information goes.

PAM: Yeh, that, part is all, is all ready to go except that the, well I'll explain it all to you when I see you on Sunday.

\* \* \* \* \* \*

PCM: And I'll have to call her to get the name of the place, right?

PAM: Yeh, I think that'll be better than over the telephone.

PCM: Yeh, OK.

\* \* \* \* \* \*

PAM: Very good. And if you have any trouble with the name of the place then I'll have to give it to you on the phone. If not, if I don't hear from you, I'll see you there Sunday.

\* \* \* \* \* \*

PAM: Now then, we're supposed to pick up, uh, six of these things, these uh translators.

PCM: Uh huh.

PAM: And it, uh, I think they, the price that they gave us was five thousand, so you be prepared for that and we'll, we'll take care of it on this end.

PCM: At that particular time?

PAM: Well, I don't know, its whatever you think it'd save us a trip.

PCM: Oh, I see what you mean. Well we'll discuss it—

PAM: Whatever you think, you're the boss.

PCM: Yeh. I understand that, but I'll have to discuss that with you, you know.

PAM: Yes, OK, whatever's right. I'll see you in, I'll see you there on Sunday.

PCM: Good enough.

PAM: All right, then.

PCM: Bye bye.

PAM: Bye.

On April 17, 1972, at 10:54 p.m., Valdes called the Keating Street phone and left the following message on the answering machine (Call # 1166):

[PCM = Valdes.]

PCM: Hotel Acapulco Imperial 2–29–50 or 2–29–51, 52 or 53. Call right away. I have a thousand pound translator that needs to be moved in the next two days. Please call right away, 2–29–50, Hotel Acapulco Imperial.

On April 19, 1972, at 8:42 p.m., Kuranty, a Gunningham associate, called from the Keating Street address and spoke to Gunningham.

[PCM = Kuranty and PAM = Gunningham.]

PAM: Uh, I got somebody calling to see what's happening. He's supposed to call me back. And, uh, who else called on the recording?

PCM: Okay. Ken, Jack, Pat, Jim Pinkerton—I got a number for him.

PAM: I don't want it.

PCM: Uh, Paul.

PAM: Yeh.

PCM: Sherri, Charles Kirt, Benny from Port Huron.

\* \* \* \* \* \*

PCM: Bob Graham.

PAM: Oh yeh.

PCM: Junior, he has a message for you.

PAM: Oh yeh.

PCM: And Valdez, and that's it.

APPENDIX B

Hajal

All of the taped calls pertaining to Hajal were obtained from Wire Interception #1 on a phone in the Keating Street house.

On April 28, 1972, at 11:11 p.m., Gunningham called Hajal (Call #1677):

Hajal: Uh, how long before he can come by?

Gunningham: He can come by in a little while. Hold on a minute, let me talk to him.

Hajal: Okay.

\* \* \* \* \* \*

Gunningham: I'll have him bring you out 4 Gs worth. Okay?

Hajal: What a half a—

Gunningham: All right.

Gunningham: Uh, you'll a take care of that right away probably, won't you?

Hajal: For sure, man. Cause, uh, like I'll be wanting more fast.

\* \* \* \* \* \*

Hajal: OK, how about is uncle[1] is there?

Gunningham: Yeh, that's uh, Sunday. And uh Monday is, uh, the other, too.

Hajal: You mean that uncle ain't around at all today.

Gunningham: Oh, you mean just for you?

Hajal: Yeh.

Gunningham: Yeh, hold on a minute. (background conversation inaudible) yeh, he's got some, a buck and a half a thing?

Hajal: Yeh.

\* \* \* \* \* \*

Gunningham: OK.

Hajal: OK.

Gunningham: I'll have him bring one in for you.

\* \* \* \* \* \*

Hajal: OK, I'll be expecting him and, uh, why don't you, uh, give me a buzz tomorrow. If you can't come by, I'll come by and see you, man.

\* \* \* \* \* \*

Gunningham: OK, you think you'll have the bread[2] together tomorrow?

\* \* \* \* \* \*

Hajal: Yeh, I'm pretty sure, I do if he'll hurry up and, uh, get over here so I can make it to the bar to see somebody.

\* \* \* \* \* \*

Gunningham: OK, he'll be there within a hour.

\* \* \* \* \* \*

Gunningham: Yeh, you got the, he says have you got the BR[3] for the uncle?

Hajal: Yeh, oh yeh.

On May 1, 1972, at 11:05 p.m., Gunningham called Hajal from Keating Street (Call #1904).

Gunningham: And, uh, I got the other thing, too, now.

Hajal: Uh, Uncle?

Gunningham: Yeh, out of sight.

\* \* \* \* \* \*

Hajal: Cause I think I got a somebody that, uh, you know like I got somebody primed up for that.

Gunningham: Yeh, well this is mine and you'll really go, you know. All the way on it. You want, uh, what do you want on this other one? A whole bunch or the same as before? Or,

Hajal: No, a whole one.

On May 5, 1977, at 2:09 p.m., Gunningham called Hajal from Keating Street (Call #2088).

Hajal: You gonna be around this way by any chance?

Gunningham: Yeh, I could probably shoot by in a couple hours.

1. According to expert witness Drug Agent Modesitt, "Uncle" means heroin.

2. According to Modesitt, "Bread" or "BR" means money.

3. See supra n. 2.

Hajal: Out of sight.

Gunningham: Why, you want another one?

Hajal: I want, no uh, I want to get 4 tomorrow.

Gunningham: Four of 'em.[4]

\* \* \* \* \* \*

Gunningham: Is this for sure tomorrow?

Hajal: Yeh, for positive.

Gunningham: OK, I'll check it out.

Hajal: My lawyer, friend.

Gunningham: Oh, OK.

Hajal: All right?

Gunningham: Bye-bye.

Hajal: OK, bye.

Also on May 5, 1972, at 10:09 p.m., Hajal called Gunningham at Keating Street (Call #2144.)

Hajal: Ah, ah, did ya check on that thing for me?

Gunningham: Huh?

Hajal: Did ya check on that for me?

Gunningham: On what? Oh, on that other?

Hajal: Ya.

Gunningham: Oh, ah, might be pretty hard. I think the only thing I can get together is one.

Hajal: Oh, really?

Gunningham: Ya. Might take a few days. A day or so. Ya know.

Hajal: Um. Mean about a day.

Gunningham: Ya.

Hajal: OK.

Gunningham: But one you can get right away though.

Hajal: Oh, but I can get the other ones?

Gunningham: Ya.

Hajal: Oh, I'll say. As long as I can, ya know.

\* \* \* \* \* \*

Hajal: Is he comin out this way?

Gunningham: Well. Ya, either him or more or one. Ya. You got any BR out for me?

Hajal: Ah, some of it.

Gunningham: Well, I was wonderin how much ya got cause I need to use it tomorrow. Can ya give me as much as possible cause I got, ah, a thing I gotta, ya know, pick up tomorrow like the other stuff, you know, that you wanted.

\* \* \* \* \* \*

Hajal: OK. Ah, want to send him over?

Gunningham: Ya. Ah.

Hajal: Ya know.

Gunningham: Ya. You need to.

Hajal: As soon as possible?

Gunningham: Huh?

Hajal: As quick as possible?

Gunningham: Ya. He might as well go on right now and if that other guy, wait a second, hold on a minute.

[background conversation.] You want to go over to Lou's right now?

Right now? . . .

Yeah I think he's kind of bogue and wants a quarter.

Hajal: Hello?

Gunningham: Ya.

\* \* \* \* \* \*

Gunningham: Have you got any, ah, you got some of that stuff left, eh? Well don't . . . you don't want that one, right tonight?

Hajal: Ah, no, not tonight. I want it tomorrow though.

\* \* \* \* \* \*

Hajal: Ah, I'm gonna let them have it, ya know, they're gonna buy it and if they like it they, ya know, like I'll do one to them tomorrow.

\* \* \* \* \* \*

---

4. Modesitt testified that "four of them" referred to four pounds; he did not know of what.

Hajal: Oh, alright. Say, is this gonna go like dynamite? Ah.

Gunningham: Well, they should be a whole lot better. Okay. How much can you lay on it tonight so I can get that thing together tomorrow?

Hajal: Ah, ah, gimme me, let's see, I'll probably be about a nickel on it anyway.[5]

Gunningham: Okay.

Hajal: OK.

Gunningham: See if you can get four on 'em, cause.

Hajal: Uh?

Gunningham: Think you can get four?[6] Together?

Hajal: I said a nickle.

Gunningham: Oh, five. Oh ya. Okay. Ah, ah, if you want just one of them things for yourself?

Hajal: Ah, ya.

\* \* \* \* \* \*

Gunningham: Okay. I got some real super stuff here I'll give you. I'll send ya.

Hajal: Oh, send me, man.

Gunningham: Ah eh. So, we doing anything with that? Can we do anything with any of that.

Hajal: Ya. I believe so, man. I'm waitin on this asshole to come back from out of town.

A few minutes after a phone call to Hajal on May 6, 1972, at 12:05 a.m., Schebergen called Gunningham from Keating Street (Call #2155).

Gunningham: Um. Umm. Ya, I'm waiting for Greg to come back. I sent him out, ah, over to Lou's you know.

Schebergen: Ya.

Gunningham: Ya. He's gonna give me five.[7] He didn't have it all, you know.

\* \* \* \* \* \*

Gunningham: He owed me seven five.

Schebergen: Oh, oh, oh. I thought you'd was talkin about.

Gunningham: No. The other one, he ah, I talked to him and he said everything, the stuff was out of sight but the people never come up with the BR yet so he said he's gonna forget it until tomorrow.

Schebergen: Ya. We'll fuck it.

Gunningham: So. I said, well, don't plan on doin nothin until you get the BR and then make sure that your, you know, well away and quiet and, I said, this has gotta be cool because it's your rack, you know, your head's on the line.

Schebergen: Ya.

### APPENDIX C

#### Glickman

On May 9, 1972, at 5:01 p.m., Glickman called Salazar at 565–3981 (Wire Interception #3 [Texas]):

PAM (Person Answering Male, Salazar): Hello.

PCM (Person Calling Male, Glickman): Hello Freddy.

Salazar: Yeah. . . . Joe just called me. . . . He has, he, because he thinks, you know, that I got something and I don't want to give him anything.

Glickman: Ha ha ha.

Salazar: And I told him, ha, I just ain't got it man . . . that's all there is to it. He said well I got somebody checkin on you. I got my boys down there.

Glickman: He's full of shit. He's just talkin.

Salazar: Ha ha.

Glickman: That's all. I haven't talked to him at all today.

Salazar: Uh huh.

Glickman: Yeah.

---

**5.** Modesitt testified that "nickel" meant $5,000.

**6.** "Four" he testified, meant $4,000.

**7.** Modesitt testified that "five" and "seven five" meant $5,000 and $7,500, respectively.

Salazar: Yeah, I'm hopin tonight.

Glickman: Huh?

Salazar: I'm hopin with all my might tonight.

Glickman: Yeah.

Salazar: Because I want to get the hell out of here.

Glickman: Yeah, me too.

Salazar: Have you talked to them other guys?

Glickman: I don't know.

Salazar: On the boy.[8]

Glickman: Which one?

Salazar: On the boy.

Glickman: Not at all. I haven't talked to anybody.

On May 9, 1972, Glickman called Salazar again at 565–3981 (Wire Interception #3) (Call #1 [Texas]):

Glickman: Well, look I talked to Joe yesterday.

Salazar: Uh huh.

Glickman: So what I'm gonna do is, I think, I'll leave today. Cause the weather is gonna turn real, real sour and I won't be able to get out of here.

Salazar: Uh huh.

Glickman: See, and uh, I'll, I'll be in touch with ya and I can use anything you can get.

Salazar: Uh huh.

Glickman: And as much as you can get. See . . .

## APPENDIX D

### Selected Jury Admonitions

[U]ntil there is evidence from which you may find that a conspiracy was established in this case, as is charged in the indictment, and that the defendants who are on trial here knowingly joined that conspiracy—and of course, you will have to find this beyond a reasonable doubt—until that is done, then evidence that is being offered here, if it is admitted subject to connection means that

it may not be used as against any one of the defendants until there has been evidence that there is such a conspiracy in existence and that the defendant against whom the evidence is being offered joined that conspiracy. But a case has to start somewhere, and that's why, in a sort of building block situation, the law permits the prosecutor to put in some evidence subject to connecting it up later.

\* \* \* \* \* \*

Now, I am permitting these recordings to be presented to you, subject to connection. That is to say, they may not be received as evidence against any of these defendants until the government has shown that a conspiracy has been proved. That is to say, until a conspiracy is shown, the statements and conversations of persons other than the defendants may not be used against the defendants, and that is for a very plain and simple reason. If the Jury finds that the defendants have knowingly and wilfully joined the alleged conspiracy, then whatever the conspiracy did or whatever the co-conspirators did, is binding on each of the parties who joined the conspiracy even though they may not have known of it at the time, or even though they may not have participated in the act or in the statement that was made. And the reason for that legally, is that if a conspiracy is shown—and it will be for you to determine beyond a reasonable doubt whether or not the government does show that—then a partnership is formed between those who joined that conspiracy knowingly and consciously, and any of the acts of one partner to the conspiracy become the acts of all of the partners to a conspiracy.

So, with that caution, these conversations that are being presented to you and read to you are being received subject to that connection. I will have more to say on that in my final instructions.

With those observations, then, I will admit government's Exhibits 350, 351, 352 and 353.

\* \* \* \* \* \*

8. "Boy," according to Agent Modesitt, is a term commonly used in the drug traffic for heroin.

■■■■■■■■

As I will explain to you at the close of the case, those acts or statements must be in furtherance of the conspiracy, and must be a part of the conspiracy, as he correctly said, and that should be kept in mind, and I will instruct you further in that regard. So, these tapes are being provisionally accepted.

\*　　\*　　\*　　\*　　\*　　\*

Heretofore, I have talked to you about the law of conspiracy, and I will have, at the close of the case, a full explanation of all of the instructions as they apply to the manner and form of your deliberations. But as these tapes are being played, you have heard the defendants, through their counsel, state that they object to the introduction of these tapes as it applies to their clients, the defendants, because there has as yet, they urge, been no proof of the commission of the conspiracy itself. And you will recall that my rulings have been: subject to connection, the tapes may be played and heard by you.

Now, so that you are more fully informed at this stage in the trial as to what the meaning of these concepts or terms are, let me say to you that there are four essential elements that are required to be proved in order to establish the offense of conspiracy charged in this indictment against these defendants:

First, that the conspiracy be described in the indictment was wilfully formed and was existing at or about the time alleged; second, that the defendants wilfully became members of the conspiracy; third, that one of the co-conspirators thereafter knowingly committed at least one of the overt acts charged in the indictment at or about the time and place alleged; and fourthly, that such overt act was knowingly done in furtherance of an object or purpose of the conspiracy as charged.

Now, with regard to the acts or declarations of co-conspirators—and you'll recall that in the indictment the indictment contains reference to the allegations that there were other co-conspirators alleged, and you have been hearing tapes with regard to their conversations, and we arrive at this point: that these acts or statements that are passing between these other co-conspirators can only be received and considered by you against the defendants who are in trial here when the conspiracy has been shown and not before. That's why I have repeatedly said to you that these conversations are being listened to by you on a provisional basis, and that it is the responsibility of the government to show a conspiracy and that the defendants here on trial wilfully joined that conspiracy. And the four elements that I have just indicated to you will have to be shown to you beyond a reasonable doubt.

Now, with regard to these tapes, these conversations, whenever it appears, beyond a reasonable doubt from the evidence in the case that a conspiracy existed and that a defendant was one of its members, then the statements thereafter knowingly made and the acts thereafter knowingly done by any person likewise found to be a member, may be considered by the Jury as to the defendant found to be a member, even though the statements and acts may have occurred in the actions and without the knowledge of the defendants, provided such statements and acts were knowingly made and done during the continuance of such conspiracy and in furtherance of some object or purpose of the conspiracy.

Otherwise, any admissions or incriminatory statements made or acts done outside of court by one person may not be considered as evidence against any person who was not present and did not hear the statement made or see the acts done.

Therefore, statements of any conspirator which are not in furtherance of the conspiracy or made before its existence or after its termination, may be considered as evidence only against the person making it. So, that when I say that these tapes are being taken subject to connection, it means that they have to be taken in that light and understood in that light, and I repeat that instruction to you again, as I have earlier: that this is being taken subject to these connections being made.