UNITED STATES of America,
Plaintiff–Appellee,

v.

J.D. ASHWORTH, a/k/a James Daniel Ashworth (86–6235) and Scott Ashworth, a/k/a Samuel Scott Ashworth (86–6236), Defendants–Appellants.

Nos. 86–6235, 86–6236.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 25, 1987.

Decided Jan. 4, 1988.

Miller, Griffin and Marks, Julie Muth Goodman (argued), Lexington, Ky., for defendants-appellants.

Louis DeFalaise, U.S. Atty., Charles L. Dause (argued), Lexington, Ky., for plaintiff-appellee.

Before KRUPANSKY, Circuit Judge; PECK and BROWN, Senior Circuit Judges.

BAILEY BROWN, Senior Circuit Judge.

Defendants-appellants J.D. and Scott Ashworth appeal their convictions on five counts in a jury trial held before the United States District Court for the Eastern District of Kentucky. They cite as error the district court's denial of their motion for a judgment of acquittal based on the insufficiency of the evidence and their alternative motion for a new trial based on the verdict's being against the great weight of the evidence. The Ashworths also maintain that they are entitled to a new trial since a government witness, on cross-examination, impermissibly testified concerning evidence that had been the subject of a pretrial suppression order. Additionally, they assert that a new trial is mandated because of prosecutorial misconduct during argument to the jury. Finally, the Ashworths contend that, even if the government witness's impermissible testimony or the prosecutorial misconduct, standing alone, are insufficient to warrant a new trial, the totality of the circumstances, including the "extremely close question of guilt, and the cumulative effect of the errors provides sufficient grounds to warrant a new trial." For the following reasons, we affirm the judgment of the district court.

## I.

At approximately 2:30 a.m. on February 12, 1984, the Henry County Tobacco Warehouse in Carrollton, Kentucky, burned to the ground. The warehouse was owned by defendants, J.D. and Scott Ashworth, and operated by their brother, the late John Wade Ashworth. Present in the building at the time it caught fire was Larry Taylor, a former warehouse employee, who had agreed to return to Carrollton from North Carolina for the ostensible purpose of reworking the warehouse tobacco in preparation for a scheduled cleanup sale. Taylor escaped the blaze by breaking an office window and climbing out.

On February 28, 1984, J.D. Ashworth submitted proof of loss forms to two insurance companies for damage caused by the fire. The First State Insurance Company ("First State"), insurer of the warehouse building, received a claim equal to the value of the warehouse. The Insurance Company of North America ("INA"), insurer of the tobacco contents, received a claim based on a loss of 130,000 pounds of "house" tobacco (warehouse-owned) and 76,000 pounds of "farmer" tobacco (tobacco owned by various farmers to be sold on consignment by the warehouse).

On May 23, 1984, J.D. Ashworth submitted an amended proof of loss to INA reflecting a loss of only 115,000 pounds of house tobacco and 8,000 pounds of farmer tobacco. He submitted fourteen warehouse bills of lading to support his claimed loss of farmer tobacco. These bills of lading showed that the destroyed farmer tobacco was owned by seven individually-named farmers. INA never paid these claims, but later paid twelve other farmers for a total of 9,189 pounds.

On June 4, 1986, the grand jury returned a five-count indictment naming J.D. Ashworth, Scott Ashworth, and Larry Taylor as defendants. Count I alleged a conspiracy to use fire to destroy property used in interstate commerce and to commit fraud by United States mail in violation of the federal conspiracy statute, 18 U.S.C. § 371.[1] Count II alleged a violation of 18 U.S.C. § 844(i),[2] which proscribes the use of fire to destroy property used in interstate commerce. Counts III and IV alleged

---

1. 18 U.S.C. § 371 provides, in relevant part:

   If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

2. 18 U.S.C. § 844(i) provides, in relevant part:

   Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not more than ten years or fined not more than $10,000, or both....

a violation of 18 U.S.C. § 1341,[3] which makes criminal the devising of a scheme to defraud and the use of the United States mail to carry out the scheme. Count V alleged a violation of 18 U.S.C. § 844(h),[4] which prohibits the use of fire to commit offenses prosecutable in United States court (namely, the mail fraud alleged in counts III and IV).

The joint trial of the Ashworths and Taylor was held on October 6—10, 1986. During cross-examination by defense counsel, a claims representative for INA testified that claims stemming from "a fire that occurred to the warehouse next door in 1983" had not been paid by Fireman's Fund Insurance Company. Although the jury did not learn of this, the warehouse "next door" was owned by the late John Wade Ashworth. Because of the potential prejudice that might accrue from disclosure of this fire, the district court had issued a pretrial order barring evidence of this prior fire on the ground that it was irrelevant.

In argument to the jury, the United States attorney referred to prior statements by J.D. Ashworth and Taylor wherein they allegedly denied talking with each other on the night of the fire. The district court later found, during a bench conference in which defendants moved for a mistrial, that the statements were not in evidence.

On October 10, 1986, the jury returned a guilty verdict as to all five counts against the Ashworths. The jury acquitted Taylor.

After trial, the Ashworths moved for a judgment of acquittal or, in the alternative, a new trial based on the following grounds: (1) there was insufficient evidence to support the guilty verdicts entitling them to a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure; (2) the jury verdict was against the great weight of the evidence entitling them to a new trial in the interest of justice under Rule 33 of the Federal Rules of Criminal Procedure; (3) the statement by the government witness during cross-examination concerning the irrelevant fire at the warehouse next door was unduly prejudicial and warranted a new trial; and (4) the United States attorney's reference in argument to the jury to statements of J.D. Ashworth and Taylor not in evidence that they did not speak to each other on the night of the fire was reversible error not cured by a subsequent jury instruction "that [the jury's] recollection of the evidence controlled and the attorney's arguments were not evidence." Additionally, the Ashworths contended that the United States attorney's statement constituted an impermissible prosecutorial comment on their failure to testify.

The district court denied the Ashworths' motions for a judgment of acquittal and a new trial holding that the evidence of guilt was sufficient to sustain the verdict, that the government witness's statement on cross-examination concerning the "other fire" was not so prejudicial as to require a new trial, and that the United States attorney's reference to alleged statements not in evidence, while error, was "neutralized" by the court's jury instruction and did not constitute a prosecutorial comment on the Ashworths' failure to testify. From the district court's judgment, the Ashworths now appeal.

## II.

### A.

The Ashworths first contend that the district court erred in overruling their mo-

---

3. 18 U.S.C. § 1341 provides:
    Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

4. 18 U.S.C. § 844(h) provides, in relevant part:
    Whoever—
    (1) uses fire or an explosive to commit any felony which may be prosecuted in a court of the United States ... shall be sentenced to a term of imprisonment for not less than one year nor more than ten years.

tion for a judgment of acquittal as to all counts based on the insufficiency of the evidence. The standard of review for insufficiency claims is: Viewing the evidence in the light most favorable to the prosecution, is the evidence "such that a reasonable mind might fairly find guilt beyond a reasonable doubt." *United States v. Ayotte*, 741 F.2d 865 (6th Cir.), *cert. denied* 469 U.S. 1076, 105 S.Ct. 574, 83 L.Ed.2d 514 (1984). In reaching this determination, *all* of the evidence adduced at trial is to be considered. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). And it must be remembered that "circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Stone*, 748 F.2d 361, 362 (6th Cir.1984). After examining the evidence adduced at trial, we conclude that the jury could have reasonably concluded that the Ashworths were guilty beyond a reasonable doubt.

At trial, the government offered evidence tending to prove the following facts:

(1) Two weeks before the fire, J.D. Ashworth terminated the employment of the warehouse night watchman, Jerry McKinney, because the tobacco selling season had ended. Arrangements were subsequently made for former nightwatchman Larry Taylor to come to Carrollton from his home in North Carolina for the avowed purpose of reworking the remaining tobacco for a cleanup sale.

(2) Also two weeks before the fire, the warehouse purchased 40,000 pounds of tobacco at 80¢ per pound. INA was obligated to pay $1.70 per pound for tobacco lost during a casualty.

(3) Three days before the fire, the Ashworths, their late brother, and Owen Harris, the warehouseman responsible for tobacco auctions, were overheard by their secretary discussing a proposed cleanup sale to be held the following week. J.D. Ashworth then directed the secretary to advise the Agricultural Stabilization Committee ("ASC"), a federal agency charged with monitoring the amount of tobacco sold by each warehouse in the United States, of their contemplated cleanup sale and to inquire whether the ASC would do their annual physical inventory of the warehouse's tobacco contents before or after the sale. The ASC informed the secretary that they would conduct the inventory after the sale.

(4) On the evening of the fire, J.D. Ashworth registered at a Motel 6 in Louisville. Two collect calls were then placed from a telephone booth near the motel to the warehouse. The latter call was placed at or near the time of the fire.

(5) Arson investigators found that the fire was caused by a petroleum-based, incendiary source.

(6) On February 28, 1984, J.D. Ashworth submitted a claim for the loss of 130,000 pounds of house tobacco to INA. On May 23, 1984, he filed an amended proof of loss with the INA downgrading the loss to 115,986 pounds of house tobacco. This figure, while comporting with ASC records,[5] was specifically contradicted by five government witnesses who testified that they had been in the warehouse between one and five days before the fire and estimated the total amount of tobacco remaining in the warehouse to be between 30,000 and 60,000 pounds.

(7) On February 28, 1984, J.D. Ashworth submitted a claim to INA for the loss of 76,000 pounds of farmer tobacco. In support of this claim, he submitted fourteen warehouse bills of lading (twelve signed by himself, two signed by Scott Ashworth), showing that the farmer tobacco was owned by seven, individually-named farmers. On May 23, 1984, he submitted an amended proof of loss downgrading the loss to 8,000 pounds.

---

5. The ASC has an agent present at a particular warehouse on each day that the warehouse holds an auction to record the amount of tobacco bought and sold by the warehouse during the auction. In order to keep track of tobacco sold by private sale, the ASC requires both the buyer and the seller to submit records of the amount of tobacco that changed hands during the transaction.

Six of the seven farmers who the Asworths represented had tobacco in the warehouse, however, stated that they had no tobacco stored in the warehouse at the time of the fire, that they had not been consulted by the Ashworths about the claims, and that they had no role in filing the claims.[6] Had the claims for lost farmer tobacco been paid, the money, in all probability, would have been paid directly to the Ashworths.

(8) On February 28, 1984, J.D. Ashworth submitted a claim for the loss of the warehouse building to First State Insurance Company. In his claim, he represented that the origin of the fire was "unknown."

The government's evidence did not go unanswered. The Ashworths pursued three lines of defense at trial. First, they offered evidence indicating that the fire *may* have been accidental or *may* have been the result of juvenile hooliganism. Second, they introduced some evidence that their claims for lost tobacco were, in fact, accurate. And, third, they offered expert testimony that the fire was an economic liability—not a boon. Reviewing the evidence produced by the Ashworths at trial in the light most favorable to the government, however, leads us to the inescapable conclusion that the jury was not *by any means* compelled to accept the Ashworths' defenses.

To support their theory of the accidental nature of the fire, the Ashworths called their own fire-cause expert, William Abney. Abney, however, did not testify that the fire *was not* the result of arson—only that the fire *may not* have been the result of arson. Additionally, Abney stated that he based his expert opinion on photographs of the burning warehouse and other "documentation." While this is acceptable evidence upon which to base an opinion, the jury cannot be required to credit Abney's equivocal testimony over that of the government's expert, James Gamm, who, with a cadre from the federal Alcohol, Tobacco, and Firearms response team, did an extensive on-site evaluation of the fire immediately after it was put out. This on-site evaluation included determining the origin of the fire, taking samples to determine whether an accelerant was present, and examining the warehouse's circuitry for any potential fire hazards.

To support their alternative theory that the fire was the result of juvenile pranksters, the Ashworths merely cross-examined government witnesses about the presence of unidentified juveniles who observed the fire at some distance and the possibility that those juveniles entered the warehouse through some hole in the building to set the blaze. Again, the jury was not required to accept such conjecture.

To substantiate their assertion that their claims for lost tobacco were genuine, the Ashworths presented evidence that INA paid out more in dollars for farmer tobacco claims than they, themselves, requested, and that their claim for destroyed house tobacco comported with ASC records. The evidence on neither of these points was compelling.

Regarding the farmer tobacco, even though INA ended up paying individual farmers benefits on a loss of 9,189 pounds of tobacco when the Ashworths' *revised* proof of loss claimed a total loss of 8,000 pounds, the government proved that the Ashworths' *original* claim for lost farmer tobacco was 76,000 pounds! The jury could have reasonably concluded that the Ashworths' revised claim was merely a belated attempt to "cover their tracks." This conclusion is particularly attractive given that six of the seven farmers who the Ashworths alleged lost tobacco during the fire testified that they had no tobacco in the warehouse at the time of the blaze.

With regards to the house tobacco, while it is true that ASC records comported with the Ashworths' claim for a loss of 115,986 pounds and that the ASC agent vouched for the reliability of the ASC's accounting system, five eyewitnesses who had been in

---

**6.** The non-testifying farmer was actually the father (and farming partner) of one of the testifying farmers. His testimony, therefore, would in all probability have been merely duplicative of his son's.

the warehouse between one and five days before the fire testified that there were only between 30,000 and 60,000 pounds remaining. The jury could have reasonably chosen to believe the five eyewitnesses' accounts over the testimony of the ASC representative, particularly given the Ashworths' apparent ploy of using a last-minute cleanup sale to forestall the ASC's year-end physical accounting of the warehouse's tobacco contents.

In order to bolster their assertion that the fire was a financial blow to them, the Ashworths called two expert witnesses. C.B. Bartlette, the Ashworths' accountant, conducted a profit and loss determination for the season of the fire and determined that, without the fire, the warehouse would have enjoyed a profit of $143,655.96. On cross-examination, however, Bartlette admitted that he based his profit determination on records supplied to him by J.D. Ashworth that indicated that the warehouse owned 116,226 pounds of tobacco at the time of the fire. If the jury had reasonably concluded that the Ashworths' claim of lost tobacco was inflated, they naturally would have discredited Bartlette's testimony.

The Ashworths' second financial expert was James Freeman, a professor of economics and finance. Professor Freeman valued the Ashworths' warehouse business by determining the present value of the stream of income the business was generating yearly. He then subtracted from that value the obligations that the Ashworths were forced to pay because of the fire and concluded that the fire yielded a net loss of $45,000 to $55,000. Freeman's testimony, however, fell victim to the same malady as Bartlette's; namely, in determining the warehouse's potential earnings for the year of the fire, he based it on a loss of 116,226 pounds of house tobacco. On cross-examination, Freeman admitted that, were the house tobacco figure dramatically lower, his valuation of the business would be different.[7]

From our examination of all the evidence adduced at trial, viewed in the light most favorable to the government, we conclude that a reasonable jury could have found beyond a reasonable doubt that a conspiracy existed between the Ashworths to burn their warehouse and defraud their insurers. Likewise, we conclude that the jury was reasonable in finding the Ashworths guilty of the other offenses charged: arson, mail fraud, and the use of fire to commit offenses prosecutable in United States courts.

Counsel for the Ashworths argue, however, that, even if there was sufficient evidence to convict J.D. of conspiracy, there was insufficient evidence to implicate Scott. This argument is without merit. Scott Ashworth participated in the conversation concerning the proposed cleanup sale and his signature graced two of the fourteen bills of lading for farmer tobacco that were found to be fraudulent. As the Second Circuit observed in *United States v. Mariani*, 725 F.2d 862, 865–66 (2nd Cir. 1984), "A defendant's participation in a conspiracy may be *inferred* from acts of his which furthered the objectives of the conspiracy. Seemingly innocent acts, taken individually, may indicate complicity in conspiracy when viewed collectively and with reference to circumstances in general."

Finally, the Ashworths maintain that the acquittal of alleged coconspirator Taylor may be considered in deciding whether the evidence was sufficient to convict them. We decline to engage in such an analysis, however, choosing, instead, to follow the sage advice offered by our court in *United States v. Meyers*, 646 F.2d 1142 (6th Cir.1981). *Meyers* held that "[s]peculation as to the jury's evaluation is both improper and futile." *Id.* at 1145.

### B.

The Ashworths next argue that, even if there is sufficient evidence to deny their

---

7. The Ashworths also claim that evidence that they spent $10,000 to repair the roof of the building before the beginning of the season is evidence that they were not engaging in arson for profit. The probative value of this evidentiary item, however, is dubious since the Ashworths could have "hatched" their arson plan after beginning a disappointing sales season.

motion for a judgment of acquittal, the district court erred in overruling their motion for a new trial based on the verdict's being against the great weight of the evidence. They cite us to *United States v. Turner,* 490 F.Supp. 583 (E.D.Mich.1979), *aff'd,* 633 F.2d 219 (6th Cir.1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed. 2d 336 (1981), in which the district court explained:

> A Motion for Acquittal and a Motion for New Trial based on the ground that the verdict is against the great weight of the evidence are governed by very different standards. The Motion for New Trial involves a much broader standard of review than a Motion for Acquittal. A verdict may well be against the great weight of the evidence, but, nevertheless, be substantial enough to permit reasonable jurors to draw an inference of guilt. In a Motion for New Trial, the trial judge can consider the credibility of the witnesses and the weight of the evidence to insure that there is not a miscarriage of justice. It has often been said that he/she sits as a thirteenth juror.
>
> Nevertheless, granting a Fed.R.Crim. P. 33 Motion for New Trial attacking the weight of the evidence is a discretionary matter. The Court should exercise such discretion only in the extraordinary circumstances where the evidence preponderates heavily against the verdict.

*Id.* at 593 (citing 2 C. Wright & A. Miller, Federal Practice and Procedure § 553, at 487 & n. 31).

*Turner* does, indeed, disclose the appropriate standard for *district courts* to follow in ruling on motions for new trials based on the verdict's being against the great weight of the evidence. The court of appeals, however, *does not* sit as a "thirteenth juror" to judge the credibility of witnesses. Neither do we reweigh the evidence. Rather, we are limited to examining the evidence produced at trial to determine whether the district court's determination that the evidence does not "preponderate heavily against the verdict" is a clear and manifest abuse of discretion. C. Wright, Federal Practice and Procedure § 559 (1982). *See also United States v.*

*Cordle,* 377 F.2d 522, 523 (6th Cir.), *cert. denied,* 389 U.S. 961, 88 S.Ct. 342, 19 L.Ed. 2d 370 (1967) (dealing with a motion for new trial based on newly discovered evidence). In the instant case, our examination of the evidence in Part A leads us to the conclusion that the district court did not abuse its discretion in determining that the jury verdict was not against the manifest weight of the evidence.

### III.

■ The Ashworths next contend that the district court abused its discretion in denying their motion for a new trial based on the government witness's testimony concerning the prior fire at the "warehouse next door." The district court concluded that the testimony "was not prejudicial to defendants, or if it was prejudicial, the prejudice was so slight that it could not warrant a new trial." We agree with the district court.

Prior to trial, the district court granted the Ashworths' motion to suppress as irrelevant evidence of a fire that occurred at a warehouse next door to the Ashworths' warehouse in 1983. The warehouse that was destroyed in the 1983 blaze was owned by the late John Wade Ashworth.

At trial, however, in response to defense counsel's question as to whether or not any other claims had been made against First State or INA that had not been paid, Wesley Adams, a government witness and representative for INA, stated:

> Yes, a claim in the amount of three hundred and some thousand dollars has been made by Fireman's Fund Insurance Company which paid that amount of money to the Government as the result of a fire that occurred to a warehouse next door in 1983—

Defense counsel, realizing that the witness was about to discuss the prior fire, began an objection, but was cut-off by the district court who responded, "You asked the question." The witness then continued, "Fireman's Fund Insurance Company insured tobacco that was owned by a government pool that was in a warehouse next door to

the warehouse that burned in 1984. That warehouse burned in early 1983."

The above colloquy readily reveals that no prejudicial testimony was elicited from the witness because of the district court's decision to allow him to continue his statement. All that Adams said was that a fire occurred at the warehouse next door in 1983 for which a claim had not been paid. Adams never intimated to the jury that the owner of the warehouse was John Wade Ashworth, the deceased brother of defendants. Furthermore, the government did not follow-up on this testimony or refer to it in closing argument. The vagueness of this isolated remark renders it non-prejudicial.[8]

### IV.

■ The Ashworths also maintain that the district court abused its discretion in denying their motion for a new trial based on the United States attorney's comment in closing argument that "Mr. Taylor and Mr. Ashworth denied talking to each other [on the night of the fire]" when that fact was not in evidence. The district court concluded that the United States attorney's comment was not sufficiently prejudicial when taken together with the court's later jury instruction that "its recollection of the evidence controlled and that the attorney's arguments were not evidence." We are in agreement with the district court.

In *United States v. Flake*, 746 F.2d 535 (9th Cir.1984), the Ninth Circuit held that "[i]mproprieties in counsel's argument to the jury do not require a new trial unless they 'are "so gross as probably to prejudice the defendant," and any resulting prejudice is not "neutralized" by the court's instructions.'" *Id.* at 542 (citations omitted). This holding informs the instant case.

In the present case, the United States attorney's comment, standing alone, is not so harmful as to "probably prejudice" the Ashworths. And any slight prejudice accruing to them was "neutralized" by the court's cautionary instruction to the jury.

Consequently, the attorney's misstatement does not require a new trial.

■ The Ashworths alternatively contend that the United States attorney's statement constitutes an impermissible comment on their failure to testify. This argument lacks merit.

In *United States v. Robinson*, 651 F.2d 1188 (6th Cir.), *cert. denied*, 454 U.S. 875, 102 S.Ct. 351, 70 L.Ed.2d 183 (1981), this court held:

> To reverse a conviction for improper comment on the criminal defendant's Fifth Amendment right to remain silent, "we must find one of two things: that 'the prosecutor's' manifest intention was to comment upon the accused's failure to testify or that the remark was 'of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'"

*Id.* at 1197 (citations omitted). Since there is no indication that the United States attorney intended his remarks to be a comment on the Ashworths' failure to testify, and the remark was not "of such a character that the jury would naturally and necessarily take it to be a comment on [the Ashworths'] failure to testify," we decline to construe the United States attorney's statement to be such.

### V.

■ The Ashworths finally contend that, even if the above-stated errors, standing alone, do not warrant a new trial, the errors, when viewed cumulatively and "with the close question of guilt" warrant a new trial. We disagree.

We have already determined that the two errors alleged by the Ashworths were non-prejudicial. We agree that "[e]rrors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair." *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir.) *cert. denied*, 464 U.S. 951, 962, 104

---

8. That this statement was not prejudicial is backhandedly supported by defense counsel who chose to de-emphasize it by not requesting

a curative instruction. *See, e.g., United States v. Whitley*, 734 F.2d 1129, 1135 (6th Cir.1984).

S.Ct. 367, 396, 78 L.Ed.2d 327, 338 (1983). However, to give much more weight to the cumulative effect of the two errors in this case would be to violate the Supreme Court's warning in *Glasser v. United States*, 315 U.S. 60, 83, 62 S.Ct. 457, 470, 86 L.Ed. 680 (1942): "We must guard against the magnification on appeal of instances which were of little importance in their setting." The Ashworths' trial may not have been perfect, but it was fair. And as this court observed in *United States v. Hajal*, 555 F.2d 558, 569 (6th Cir.1977), "we have yet to review a perfect jury trial."

For the foregoing reasons, the judgment of the district court is AFFIRMED.