887 F.2d 266
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Bruce COLEMAN, Defendant-Appellant.
 No. 88-1936.
 United States Court of Appeals, Sixth Circuit.
 Oct. 11, 1989.
 
 Before WELLFORD and RYAN, Circuit Judges, and CONTIE, Senior Circuit Judge.
 RYAN, Circuit Judge.
 
 
 1
 Defendant appeals his conviction on one count of conspiracy to commit arson, in violation of 18 U.S.C.A. Sec. 371 (1966). This appeal presents, inter alia, a close question of whether the jury's consideration of jeopardy-barred allegations against the defendant tainted its consideration of the charges for which he was ultimately convicted. Because we conclude that defendant has failed to demonstrate a reasonable probability that he would not have been convicted but for the jury's improper exposure to the jeopardy-barred allegations, and because none of defendant's other assignments of error are meritorious, we affirm his conviction.
 
 I.
 
 2
 Defendant was indicted on February 2, 1988 on one count of conspiracy to commit arson, in violation of 18 U.S.C.A. Sec. 371 (1966), and one count of attempted arson, in violation of 18 U.S.C.A. Sec. 844(i) (Supp.1989) and 18 U.S.C.A. Sec. 2 (1969). At trial, the Government presented evidence indicating that defendant, along with his brother, Ronald Coleman, and Andrew Boscaglia, entered into an arrangement in February 1983 with David Sefansky whereby they agreed to provide approximately forty-five video machines which they would operate at a pizza parlor, run by Sefansky, known as Papa Roni. Defendant agreed that the three would pay $7,000 monthly rental to Sefansky who would, in turn, remit it to the landlord and, in addition, pay Sefansky $750 per week from the income generated by the video machines. By March 1983, defendant and his partners were $14,000 behind in rent, and the landlord began eviction proceedings.
 
 
 3
 In January 1983, defendant had insured the video machines subsequently installed at Papa Roni through an agent with whom he had done business for several years. The machines were insured for $100,000.
 
 
 4
 The principal witness against defendant was his partner, Andrew Boscaglia, who was given immunity from prosecution in exchange for his testimony. Boscaglia testified that by March 1983, it was apparent that, for a number of reasons, the Papa Roni venture would not be successful. Boscaglia testified that after the landlord began eviction proceedings for nonpayment of the rent, defendant, his brother, and Boscaglia agreed to burn the building down in order to collect the insurance money on the machines. Boscaglia stated that the conversation in which this plan was discussed took place at Papa Roni, and that it was agreed that Ronald Coleman would make the arrangements for the arson. With respect to defendant's participation, Boscaglia testified as follows:
 
 
 5
 Q: In regards to the agreement you had, I believe you indicated that Bruce Coleman was present?
 
 
 6
 A: Yeah.
 
 
 7
 Q: Do you recall what Bruce Coleman said?
 
 
 8
 A: We just all said, go for it, you know.
 
 
 9
 Boscaglia further testified that he subsequently participated in a 1984 meeting with defendant and Ronald Coleman in which all three agreed to keep quiet about the attempted arson.
 
 
 10
 On cross-examination, Boscaglia stated that although the machines were insured for $100,000, they were worth only $20,000 to $30,000. He testified that the meeting at which the arson was planned took place right before defendant left on vacation, and that defendant was away on vacation when the attempted arson took place. Boscaglia testified that the discussion concerning the details of the arson was between himself and Ronald Coleman, but that defendant agreed to the plan.
 
 
 11
 [Defense Counsel ]: Bruce Coleman did not suggest to you that an arson take place, correct?
 
 
 12
 [Boscaglia ]: No.
 
 
 13
 [Defense Counsel]: Bruce Coleman did not indicate to you who he was going to make the arrangements for the arsonist?
 
 
 14
 [Boscaglia ]: No.
 
 
 15
 [Defense Counsel ]: Bruce Coleman at that time did not tell you who he was going to provide any money at that time?
 
 
 16
 [Boscaglia ]: No.
 
 
 17
 [Defense Counsel ]: And all Bruce Coleman was, was standing around in a meeting, according to your testimony and you discussed an arson to take place?
 
 
 18
 [Boscaglia ]: Yes.
 
 
 19
 [Defense Counsel ]: Is it not a fact that Bruce Coleman looked at you and said, I don't want to have anything to do with it, I'm on vacation, you do what you got to do?
 
 
 20
 [Boscaglia ]: He could have. I don't remember if he said that or not.
 
 
 21
 On redirect, Boscaglia again stated that all three men were in accord on the attempted arson and that defendant may have said words to the effect that he would be on vacation, "do what you have to do."
 
 
 22
 The Government introduced evidence indicating that Anthony Vais and Ernest Ney were approached by Ronald Coleman and asked to burn the Papa Roni building. After inspecting the building, the two men agreed to torch it. Ronald Coleman gave them a down payment of $5,000. On the evening of April 2, 1983, the pair attempted to set the building on fire, but they were interrupted by David Sefansky and his son Bryan who telephoned the police. Vais and Ney were apprehended by the police and subsequently convicted of attempted arson. Both men testified that they had no contact whatever with defendant with respect to the arson agreement.
 
 
 23
 At the close of the Government's case, defense counsel asked to address the court outside the presence of the jury without specifying what he intended to say. The court refused the request, stating "[w]e can do that later. Thank you." After defendant had presented three witnesses, the jury was excused for the day and defendant moved for acquittal pursuant to Fed.R.Crim.P. 29(a). After initially denying the motion, the court reserved ruling until 4:00 p.m. that afternoon. At 4:00 p.m., the court heard argument on the motion from both counsel and then denied the motion with respect to Count I, the conspiracy count, but granted it with respect to Count II, the attempted arson count. The next morning, before the jury returned, the trial judge changed his mind and reinstated Count II, the attempted arson count.
 
 
 24
 After the defense presented its case, the court heard objections to its proposed jury instructions. Defense counsel objected to the court's instruction defining attempt on the ground that it did not require that the defendant take a "substantial step" toward completion of the crime, and offered his proposed Instruction 14 in its place. The court overruled the objection and rejected the proposed substitute instruction. The court did instruct the jury to consider each count separately, stating: "The fact that you may find the defendant not guilty or guilty as to one count does not control your verdict as to the other count."
 
 
 25
 After the jury had deliberated for thirteen hours, the foreperson sent out a note to the court which read: "We are deadlocked. What should we do?" After discussion with counsel, and over defendant's objection, the court instructed the jury as follows:
 
 
 26
 You may be seated. I have a note which reads: We are at a deadlock. What should we do?
 
 
 27
 I am going to give you another instruction.
 
 
 28
 First, you know that in order to return a verdict each juror must agree to the verdict.
 
 
 29
 Second, jurors have a duty to consult with one another and to deliberate together and to continue to do so with a view towards reaching an agreement, if it can be done without violence to individual judgment.
 
 
 30
 Third, each juror must decide the case for himself or herself but this decision can be made only after an impartial consideration of the evidence with his or her fellow jurors.
 
 
 31
 Fourth, in the course of his or her deliberations, a juror should never hesitate to reexamine his or her own views and to change his or her opinion, if convinced it is erroneous.
 
 
 32
 Fifth, each juror who finds himself or herself in the minority should reconsider his or her views in light of the opinions of the majority, and each juror who finds himself or herself in the majority should give equal consideration to the views of the minority.
 
 
 33
 Sixth, no juror should surrender his or her honest conviction as to the weight or effect of the evidence for the mere purpose of returning a verdict.
 
 
 34
 Ladies and gentlemen of the jury, the task of being a juror is not, as you know, an easy one. On occasion it takes a good deal of time to deliberate and to consult with one another before agreement is finally reached.
 
 
 35
 I ask that you consider the matters I have just presented to you and returned [sic] to the jury room to continue your deliberations for a period of time.
 
 
 36
 Thank you.
 
 
 37
 The jury subsequently returned a verdict of guilty on Count I, the conspiracy count, and not guilty on Count II, the attempted arson count. Defendant thereafter filed a motion for acquittal or, in the alternative, a new trial pursuant to Fed.R.Crim.P. 29(a) and 33. The district court issued an opinion denying the motion. The court held that Boscaglia's testimony, when taken with the evidence that defendant had procured $100,000 in insurance for the video machines, provided sufficient evidence to support defendant's conviction for conspiracy. The court rejected the defendant's motion for a new trial on the ground that "the Court would have voted with the jury and that is all that is required for denial of the motion." The court admitted that it had erred by not ruling immediately on defendant's motion to acquit following the close of the Government's case and by reinstating the attempted arson count, but held that both errors were harmless because the jury acquitted defendant on the reinstated count and defendant made no showing that the jury's consideration of the conspiracy count was influenced by its consideration of the attempted arson count. The court noted that its instruction on the definition of attempt may also have been erroneous, but this error too was rendered harmless by the jury's acquittal. Finally, the court rejected defendant's objection to its modified Allen instruction on the ground that there was nothing coercive about it.
 
 
 38
 The court sentenced defendant to three years' imprisonment, but released him pending appeal. This appeal ensued.
 
 II.
 
 39
 Defendant first argues that the district court's admittedly erroneous reinstatement of the attempted arson count, in violation of his fifth amendment right not to be twice placed in jeopardy, requires the reversal of his conviction for conspiracy on the ground that the jury may have compromised by acquitting defendant on the attempted arson count and convicting on the conspiracy count.[1] Defendant relies upon the Supreme Court's decision in Price v. Georgia, 398 U.S. 323 (1970). There, the state brought the defendant to trial for murder and the jury convicted him of manslaughter. The manslaughter conviction was reversed on appeal and the state tried him once again for murder. The second jury also convicted him of the lesser offense of manslaughter. The Court held that the second prosecution for murder violated the prohibition against double jeopardy because the first jury had impliedly acquitted the defendant of murder. Id. at 329. The Court reversed the second conviction for manslaughter because it could not "determine whether or not the murder charge against petitioner induced the jury to find him guilty of the less serious offense of voluntary manslaughter rather than to continue to debate his innocence." Id. at 331.
 
 
 40
 But we think defendant's reliance upon Price is misplaced. The Supreme Court has subsequently explained:
 
 
 41
 Neither Benton [v. Maryland, 395 U.S. 784 (1969) ] nor Price suggests that a conviction for an unbarred offense is inherently tainted if tried with a jeopardy-barred charge. Instead, both cases suggest that a new trial is required only when the defendant shows a reliable inference of prejudice....
 
 
 42
 Accordingly, we hold that when a jeopardy-barred conviction is reduced to a conviction for a lesser included offense which is not jeopardy barred, the burden shifts to defendant to demonstrate a reasonable probability that he would not have been convicted of the non-jeopardy-barred offense absent the presence of the jeopardy-barred offense. In this situation, we believe that a "reasonable probability" is a probability sufficient to undermine confidence in the outcome.
 
 
 43
 Morris v. Mathews, 475 U.S. 237, 246-47 (1986).
 
 
 44
 Defendant argues that the Morris reasonable probability test does not govern the facts of the case at bar because the Court limited its Morris holding to cases where the jury convicted the defendant of a jeopardy-barred greater offense, and therefore, a fortiori, also convicted on the lesser included offense. Although this was the factual situation before the Morris Court, the Court made it clear that the reasonable probability test applies to all cases where "a conviction for an unbarred offense is ... tried with a jeopardy-barred charge." Id.
 
 
 45
 Applying this standard to the case at bar, it is plain that defendant has not met his burden of demonstrating a reasonable probability that the attempted arson charge tainted the jury's consideration of the conspiracy charge. He has offered only unsupported speculation that the jury may have compromised by convicting on the conspiracy charge and acquitting on the attempted arson charge. But we think there are at least two reasons for concluding that the jury verdict on Count I was not tainted by the jeopardy-barred Count II. First, the court instructed the jury that the two counts were to be considered separately and that its verdict on one was not to affect its decision on the other. There is no indication that the jury did not follow this instruction. Indeed, we assume the jurors followed the court's instructions. Cf. United States v. Busacca, 863 F.2d 433, 438 (6th Cir.1988). Second, after the jury sent out a note stating that it was deadlocked, the court questioned the foreperson about the deadlock and learned that the jury could not reach agreement on the conspiracy count and that "[t]he deadlock is on Count I [the conspiracy count] because we haven't gotten to Count II [the attempted arson count]." This provides a direct indication that the jury did not allow its consideration of the barred count to affect its deliberations on the conspiracy count.
 
 
 46
 We hold that because defendant has failed to show "a reasonable probability that he would not have been convicted of the non-jeopardy-barred offense absent the presence of the jeopardy-barred offense," Morris, 475 U.S. at 247, his conviction for conspiracy need not be reversed.
 
 III.
 
 47
 Defendant next contends that the district court erred by failing to instruct the jury that a defendant must take a "substantial step" toward completion of a crime in order to be guilty of an attempt. As the district court held, any error on this point was plainly harmless because the jury acquitted defendant on the attempted arson count. Defendant has not offered a theory on how any error as to this instruction could have prejudiced the jury's consideration of the conspiracy count. We conclude that any error as to this instruction was harmless.
 
 IV.
 
 48
 Defendant argues that the district court's modified Allen charge, see Allen v. United States, 164 U.S. 492, 501 (1898), deprived him of due process. In Williams v. Parke, 741 F.2d 847 (6th Cir.1984), cert. denied, 470 U.S. 1029 (1985), we reiterated our direction that the "federal trial courts 'hew closely to the language used in the original Allen charge' ... as an exercise of this court's supervisory powers to avoid the difficult 'task of weighing the prejudicial impact of a variation of the approved charge'...." Id. at 850 (quoting United States v. Scott, 547 F.2d 334, 336-37 (6th Cir.1977)). Variations will be approved only if they are shown not to be coercive. Id.
 
 
 49
 In this case, defendant has failed to point to any variation between the district court's instruction and that approved in Allen which rendered it more coercive. Indeed, the one significant variation we could find was actually less coercive than Allen--the district court balanced the instruction that members of the minority consider carefully the views of the majority with a like instruction that jurors in the majority give equal consideration to the views of the minority. Compare Allen, 164 U.S. at 501 with supra at 4-5. We hold that the district court's Allen charge did not deprive defendant of due process.
 
 V.
 
 50
 The defendant next argues that the district court erred by denying his Rule 29 motion for acquittal on the conspiracy charge. The district court may grant a Rule 29 motion only if the evidence is insufficient to support conviction. The standard of review for claims of insufficiency of the evidence requires this court to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original).
 
 
 51
 Applying that standard to the case at bar, we conclude that a rational trier of fact could have convicted defendant of conspiracy. The testimony of Boscaglia, when taken in conjunction with the evidence which demonstrated that defendant had insured the video machines for $100,000, linked defendant to the conspiracy. It is true that, according to Boscaglia, the defendant was not an active participant in the planning meeting. Nevertheless, Boscaglia testified unequivocally that defendant agreed to the plan to burn the Papa Roni building. That defendant may have indicated that Boscaglia and Ronald Coleman could do whatever they had to do while he was on vacation does not contradict Boscaglia's testimony that defendant agreed to the plan. As defendant points out on appeal, Boscaglia's credibility was very much in issue at trial, but the jury resolved the issue against defendant. The jury's decision on "the credibility of witnesses is not reviewable on appeal." United States v. Kaufman, 862 F.2d 236, 238 (9th Cir.1988). We hold that sufficient evidence supports the jury's conviction of defendant.
 
 VI.
 
 52
 Defendant next objects to the district court's denial of his motion for a new trial. He devotes most of his argument on this point to an attack on the credibility of Boscaglia. We have expressed approval of the notion that a trial judge, in determining whether a new trial is warranted because the verdict is against the great weight of the evidence, " 'can consider the credibility of witnesses and the weight of the evidence to insure that there is not a miscarriage of justice. It has often been said that he/she sits as a thirteenth juror.' " United States v. Ashworth, 836 F.2d 260, 266 (6th Cir.1988) (quoting United States v. Turner, 490 F.Supp. 583, 593 (E.D.Mich.1979), aff'd, 633 F.2d 219 (6th Cir.1980), cert. denied, 450 U.S. 912 (1981)).
 
 
 53
 The court of appeals, however, does not sit as a "thirteenth juror" to judge the credibility of witnesses. Neither do we reweigh the evidence. Rather, we are limited to examining the evidence produced at trial to determine whether the district court's determination that the evidence does not "preponderate heavily against the verdict" is a clear and manifest abuse of discretion.
 
 
 54
 Ashworth, 836 F.2d at 266 (emphasis in original). For the reasons discussed above with reference to defendant's sufficiency of the evidence argument, we conclude that the district court's finding that the verdict was not against the great weight of the evidence does not constitute "a clear and manifest abuse of discretion."
 
 VII.
 
 55
 Finally, defendant argues that the cumulative effect of the errors discussed above was such that he was denied a fundamentally fair trial. This argument has no merit as the only errors which were committed did not affect the jury's consideration of the conspiracy count. As discussed above, the district court's erroneous decision to submit the attempted arson count to the jury in violation of the double jeopardy clause did not taint the jury's deliberations on the conspiracy count. Any error with respect to the jury instructions on attempt was rendered harmless by the jury's acquittal on that charge. We hold that the errors committed at defendant's trial did not deprive him of a fundamentally fair trial. Defendant's conviction is accordingly AFFIRMED.
 
 
 56
 WELLFORD, Circuit Judge, dissenting.
 
 
 57
 While I agree with my colleague as to Parts IV and V of his opinion, I dissent from the affirmance of the conviction under the circumstances of this case.
 
 
 58
 The principal witness, indeed the only significant witness, against Bruce Coleman, was a disgruntled partner, Andrew Boscaglia, given immunity for his testimony, who admitted a bias against defendant. Boscaglia had two prior felony convictions, including a drug charge, and confessed to other bad acts. Boscaglia lied to the government by initially stating that he was not involved in the arson attempt. He later changed his story, stated that he was involved, but did not incriminate Coleman. Boscaglia's testimony at trial was in a number of respects inconsistent. Although he indicated that Bruce Coleman consented to the "alternate plan" for arson, he also testified that Coleman did not say anything at the meeting, did not participate in any details of the arson attempt, did not discuss how to pay the arsonists, and did not receive any division of any insurance proceeds. Boscaglia admitted that he gave false testimony to the grand jury. He owed Coleman between $6,000 and $11,000, and he was angry because he received no part of the settlement for the video machines. ATF agents discussed with Boscaglia incriminating others because they had information against him regarding other arsons. It is also important to note that Coleman's insurance agent was still dealing with Coleman at the time of the trial despite the charges of arson made against him. Coleman testified that he thought that the machines actually were going to be loaded onto a truck by Boscaglia and moved back to his operation several miles away; he was on a planned vacation when the arson attempt occurred. Boscaglia conceded that he was not sure whether or not Bruce Coleman told him at the meeting "I don't want to have anything to do with it [the arson attempt]."
 
 
 59
 Neither the insurance agent nor another video machine vendor questioned the amount of the insurance policy, which was taken out several months prior to the arson attempt. In addition, Coleman called his insurance agent prior to leaving for vacation, and told him that the rider on the machines in the video arcade needed to be cancelled. This is an unusal act for a person charged with attempted arson and trying to collect insurance proceeds. Coleman had no previous convictions and was not asserted to be involved in other similar bad acts.
 
 
 60
 The appellant urges that he was prejudiced merely by having two counts, rather than a single count, submitted to the jury. Such a procedure, where one count is barred, may be impermissible. See Price v. Georgia, 398 U.S. 323, 331 (1970). Had only one count been before the jury, he contends he would have had a greater chance of acquittal, because the deliberations would have focused on acquittal or conviction on one count only.
 
 
 61
 The district court agreed, before changing his mind, that defendant should be acquitted on Count Two. Yet he submitted a charge on this "reinstated" count to the jury which returned to report, after many hours of deliberation, a deadlock.
 
 
 62
 My colleague concedes that this appeal presents a "close question." I agree, and would proceed then logically to consider whether the erroneous handling of the second count by the district judge demonstrated a reasonable basis for prejudice to the defendant. I believe what happened at the trial, in addiiton to the questionable case made against Bruce Coleman, "shows a reliable inference of prejudice" against Coleman. See Morris v. Matthews, 475 U.S. 237, 246 (1986) (emphasis added). In both Price and Morris, moreover, it is to be remembered that the "jeopardy barred charge" involved a lesser-involved offense. Attempted arson is not a lesser-included offense conspiracy.
 
 
 63
 I have stated that I agree (with Part V of Judge Ryan's opinion) that defendant was not entitled to a judgment of acquittal or directed verdict on the conspiracy charge. I entertain a substantial doubt, however, about the circumstnces of conviction and would therefore grant Coleman a new trial on this charge untainted by another count which is now forever barred from further prosecution.
 
 
 64
 I therefore DISSENT from affirmance of the conviction.
 
 
 
 [1]
 The United States argues that because no proceedings occurred between the district court's acquittal and his reinstatement of the attempted arson count the following morning, there was no double jeopardy violation. We need not pass upon this argument given our conclusion that the jury's consideration of the conspoiracy count was not tainted by the attempted arson count. We nevertheless note that we have grave doubts that such an argument could succeed given the Supreme Court's decision in United States v. Martin Linen Supply Co., 430 U.S. 564, 570-75 (1977)