**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Dean TURNER, Defendant–Appellant.**

No. 00–1109.

United States Court of Appeals,
Sixth Circuit.

Oct. 2, 2001.

Before CLAY and GILMAN, Circuit Judges; and WISEMAN, Senior District Judge.[*]

WISEMAN, Senior District Judge.

Dean Turner ("Appellant" or "Defendant") appeals his conviction on two counts of mail fraud in violation of 18 U.S.C. § 1341, and one count of making a false statement in a matter within the jurisdiction of the United States in violation of 18 U.S.C. § 1001.

On appeal, Appellant raises three assignments of error: 1) the evidence was insufficient to support his convictions beyond a reasonable doubt; 2) the verdicts were against the great weight of the evidence; and 3) his Sixth Amendment right of confrontation was violated. The United States of America ("Appellee" or "government") responds that the trial court correctly found the evidence to sufficiently

support the jury's verdicts, that the trial court did not err by cutting short Defendant's cross-examination of a government witness, and asserts that the Appellant's convictions should therefore be affirmed.

For the reasons set forth below, Appellant's convictions are AFFIRMED.

## I.

On May 26, 1998, Defendant was indicted in a federal grand jury's second superseding indictment charging him with one count of conspiracy to commit mail fraud and securities fraud, fourteen counts of mail fraud in violation of 18 U.S.C. § 1341, one count of making a false statement in a matter within the jurisdiction of the Securities and Exchange Commission in violation of 18 U.S.C. § 1001, and two counts of securities fraud. Following a six-week jury trial, Defendant was acquitted of the conspiracy charges and of the charges related to his alleged involvement in a scheme to defraud investors. Defendant was convicted of two counts of mail fraud and the single count of making a false statement.

The district court denied Defendant's post-verdict motions for judgment of acquittal and for a new trial. Defendant was sentenced on January 20, 2000, to concurrent terms of eighteen months imprisonment on each count, to be followed by two years of supervised release. It is from Defendant's conviction and sentence that he now timely appeals.

## II.

In the 1980's, William Malek ("Malek") was an owner of National Business Funding, a company that sold investments in a pooled fund created to purchase equipment to be leased to other businesses. Malek

---

[*] The Honorable Thomas A. Wiseman, Jr., Senior Judge, United States District Court for the Middle District of Tennessee, sitting by designation.

subsequently spun off a business he called Lease Equity Fund ("LEF") in which individual investments were secured by specific equipment leases or portions of leases. Various brokers were employed to obtain individual investments in the LEF bond pool.

At some point in 1988 or 1989, Defendant was introduced to Malek as a potential LEF investor. At the time of the introduction, Defendant worked as a broker for Penn Securities. Malek offered to pay Defendant a percentage of each LEF investment Defendant sold. By 1989–1990, Defendant had not only invested in LEF, he had also brought in a number of investors. In 1990, Defendant earned between $250,000 and $300,000 from LEF.

In 1990, Defendant began working for the brokerage firm Dean Witter Reynolds ("DWR"), in the Troy, Michigan branch. When Defendant was hired in 1990, he was told by his branch manager, Raymond Basile ("Basile"), that he would not be allowed to sell LEF securities while employed by DWR. Basile specifically advised Defendant that he would not be allowed to sell any investments or financial products that were not approved by DWR. According to Basile, this policy was adopted by DWR because of the firm's concern that such a policy was required by the rules of the National Association of Securities Dealers ("NASD") to avoid conflicts of interest. Basile testified that at the time of Defendant's hiring, Defendant stated that he had no problem ceasing all activities with LEF.

At the commencement of his employment with DWR, Defendant was required to fill out what is known as a U–4 ("Uniform Application for Securities Industry Registration or Transfer") form ("U–4"). Every new hire in the securities business is required to fill out a U–4 because it apprizes the securities industry of the individual's past and current employment and securities dealings. Defendant completed a U–4 at the commencement of his employment with DWR. The U–4 was mailed to DWR's New York office and it was filed with the NASD and used by the Securities and Exchange Commission ("SEC"). On this initial U–4, completed August 7, 1990, Defendant left blank Question 20, which required him to disclose any outside employment.

Employees of DWR are also required to complete a "Branch Audit Questionnaire" ("BAQ") each year. The BAQ requires employees to disclose all employment and business relationships. Defendant failed to disclose his ties to LEF and National Business Funding on the questionnaires he submitted. All DWR brokers were also required annually to sign an acknowledgment that they were familiar with the "account executive compliance guide." This guide explained firm and industry rules, including the rule that brokers were only authorized to sell securities that were registered or approved by NASD or the New York Stock Exchange.

According to the evidence presented at trial, Defendant continued to sell LEF securities and to receive compensation from LEF after he began working at DWR. An employee of LEF testified that she frequently delivered LEF instruments to and picked up checks from Defendant at his office at DWR. The evidence further indicated that although all of the investments in LEF were supposed to be tied to specific equipment leases, Malek and Defendant used LEF funds to invest in at least two unrelated business ventures—a Florida cable company that was eventually renamed NBF Cable, and a start-up airline company in Detroit called Jet U.S. At some point during Defendant's employment with DWR, Malek renegotiated Defendant's LEF compensation to a salary-based plan

under which Defendant received a salary of about $100,000 per year, an American Express credit card, and an automobile with insurance.

In 1991, DWR lodged a complaint against LEF broker Mike Czerny ("Czerny") alleging that Czerny was stealing DWR clients. Czerny denied the allegation and explained to the regional vice president of DWR that Defendant was involved in the leases with LEF. In August of 1992, Czerny spoke with George Kolar ("Kolar"), a branch manager of DWR in Michigan, and explained that Defendant was selling LEF investments, that DWR customers had purchased leases from Defendant, and that Defendant was receiving compensation from LEF for the sales. Czerny told Kolar that he had a copy of an IRS Form 1099 showing $57,000 in income to Defendant from LEF. These activities constituted serious violations of both DWR and NASD rules.

Based upon this information, Kolar and Basile met with Defendant on August 18, 1992. Defendant was questioned about his background, his earnings, his tax return, and his relationship with LEF. Defendant told Kolar and Basile that he was an investor in LEF himself and had received debt repayment from LEF, but denied selling or recommending LEF to anyone else and denied receiving compensation from LEF. When specifically asked whether he was selling or recommending the LEF funds to anyone inside or outside of DWR, Defendant replied "absolutely not." Satisfied with Defendant's explanations, DWR determined that no further inquiry was necessary at that time.

In 1994, Defendant submitted an amended U–4 providing notification that a lawsuit mentioned on his initial U–4 had been settled. On this amended U–4, Question 20, which asked whether Defendant had any outside income or employment, was checked "no." Defendant signed the amended U–4 and it was mailed to DWR's New York office, filed with the NASD, and used by the Securities and Exchange Commission ("SEC").

In June of 1995, the Federal Bureau of Investigation ("FBI") opened an investigation into LEF. FBI Special Agent Diane Ruffino met with Defendant on November 20, 1995. Defendant denied he was selling LEF through DWR, but admitted that he had received "consulting fees" from Malek and that he was an officer of the LEF-funded company known as NBF Cable. LEF had closed its business office on November 3, 1995. In December of 1995, DWR terminated Defendant. DWR later secured Defendant's office at DWR; however, Basile testified that "everything was already gone." With Malek's cooperation, the FBI continued its investigation of Defendant and other individuals involved with LEF. The investigation subsequently revealed that LEF owed Defendant's clients $10,025,943.30.

### III.

Appellant first claims that the evidence was insufficient to support beyond a reasonable doubt his convictions for mail fraud and making a false statement. When reviewing a challenge to the sufficiency of the evidence, this Court views the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *See United States v. Jones,* 102 F.3d 804, 807–08 (6th Cir.1996). A defendant making such a challenge bears a very heavy burden. *See United States v. Vannerson,* 786 F.2d 221, 225 (6th Cir.1986). Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not re-

move every reasonable hypothesis except that of guilt. *Id.*

A. *Elements of Mail Fraud in Violation of 18 U.S.C. § 1341 and Elements of Making a False Statement in Violation of 18 U.S.C. § 1001.*

A conviction for mail fraud requires proof beyond a reasonable doubt of the following three elements: (1) devising or intending to devise a scheme to defraud (or to perform specified fraudulent acts); (2) involving a use of the mails; and 3) for the purpose of executing the scheme or attempting to do so. *United States v. Oldfield,* 859 F.2d 392, 400 (6th Cir.1988). In addition, the prosecution must prove that the defendant had the specific intent to deceive or defraud. *United States v. Frost,* 125 F.3d 346, 354 (6th Cir.1997).

A conviction for mail fraud may be secured even if the defendant did not personally use the mails. *See United States v. Griffith,* 17 F.3d 865, 874 (6th Cir.1994). A mail fraud conviction requires only a showing that the defendant acted with knowledge that use of the mails would follow in the ordinary course of business, or that a reasonable person would have foreseen use of the mails. *Frost,* 125 F.3d at 354. The mailing "need only be closely related to the scheme and reasonably foreseeable as a result of the defendant's actions." *Id.* (quoting *United States v. Silvano,* 812 F.2d 754, 760 (1st Cir.1987)).

To obtain a conviction for making a false statement in violation of § 1001, the prosecution must prove the following elements beyond a reasonable doubt: (1) the making of a statement; (2) falsity of such statement; (3) knowledge of the falsity of the statement; (4) relevance of such statement to the function of a federal department or agency; and (5) that the false statement was material. *United States v. Brown,* 151 F.3d 476, 484 (6th Cir.1998).

By its terms, 18 U.S.C. § 1001 "covers 'any' false statement-that is, a false statement 'of whatever kind.'" *Brogan v. United States,* 522 U.S. 398, 400, 118 S.Ct. 805, 139 L.Ed.2d 830 (1998). This court has described the requisite intent necessary to secure a conviction under § 1001 as follows:

A false representation is one ... made with an intent to deceive or mislead. The statute does not, however, require an intent to defraud—that is, the intent to deprive someone of something by means of deceit. In this sense, the False Claims Act seeks to protect more than the simple proprietary interests of the federal government; it has for its object the protection and welfare of the government.

*Brown,* 151 F.3d at 484. "It is clear that if a defendant deliberately ignores a high probability that a form contains material false information, the requisite specific intent has been established." *Id.*

B. *The 1994 U–4 Form: Mail Fraud & False Statement*

One of Appellant's mail fraud counts was based on the mailing of his 1994 U–4 by DWR to the NASD, wherein Appellant had made a false statement regarding his business activities with LEF. Appellant argues that the evidence was insufficient to show intent to defraud or intent to mislead on a material, as opposed to a trivial or incidental, matter. Appellant claims that the preliminary pages of his amended U–4 containing the alleged false statement were prepared by someone else, and that the intended purpose of filing the amended U–4 was completely incidental to his alleged false answer to Question 20. Appellant maintains that the significance of this fact is that he could have easily signed the 1994 U–4 form with-

out realizing that there were errors on the preliminary pages, and that the fact that he did not notice errors before signing it was inadvertent and not deliberate. Accordingly, Appellant asserts that a reasonable jury could not have found that he intentionally made a false statement on a material issue. We disagree.

The government presented evidence that Defendant was expressly informed that he was not allowed to sell LEF securities while employed by DWR, but that Defendant nonetheless continued to sell these securities after beginning his employment at DWR. Testimony presented at trial described Defendant as taking great care to hide his activities with LEF from DWR. The evidence also indicated Defendant was aware that his U-4 would be mailed from the DWR office in Michigan to the DWR office in New York. Viewing the evidence in the light most favorable to the government, a reasonable juror could find beyond a reasonable doubt that Defendant, at a minimum, deliberately ignored a high probability that the amended U-4 contained material false information. Further, a reasonable juror could infer that Defendant's failure to truthfully answer Question 20 on his amended U-4, knowing it was to be mailed to New York, was a deliberate act as part of his scheme to defraud. Thus, only the question of the materiality of the false statement remains.

■ A statement is material for purposes of 18 U.S.C. § 1001 "if it has the natural tendency to influence or is capable of influencing the federal agency." *United States v. Gaudin,* 515 U.S. 506, 509, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995). It is not necessary to show that the statement actually influenced an agency, but only that it had the capacity to do so. *United States v. Blandford,* 33 F.3d 685, 705 (6th Cir.1994). The U-4 form was itself addressed to the NASD and ultimately reached the SEC. The government presented testimony that "the SEC in fact considers this form the official source for the industry," and that the form "is also used by state regulators in the securities area and other self-regulatory organizations, such as the New York Stock Exchange and the Chicago Board of Trade." Testimony was also presented establishing that Question 20 of the U-4 is relied upon by NASD and the SEC to keep abreast of any outside activity that the broker may have, as well as to monitor conflicts of interest and to prevent insider trading. Thus, from the evidence presented by the government, a reasonable juror could find beyond a reasonable doubt that the false information submitted by Defendant on the 1994 U-4 was material.

## C. *The DWR Branch Audit Questionnaire: Mail Fraud*

■ Appellant was also found guilty of mail fraud in connection with his 1995 BAQ that contained a false answer and was mailed from DWR in Michigan to DWR in New York. Appellant claims that he presented uncontradicted evidence at trial that the false answer on his 1995 BAQ is not in his handwriting. Appellant admits that much of the writing on the BAQ is his and that he did sign the BAQ. Appellant further claims that the government presented no evidence for a jury to infer that Defendant had any knowledge that the BAQ would be mailed to DWR's main office in New York. We find Appellant's claim lacking in merit.

Regardless of whether Appellant filled out every portion of the BAQ in his own handwriting, or if someone else filled in portions at his direction, the fact remains that Appellant signed the BAQ and was aware of his responsibility to complete the form accurately. Although the sufficiency of the evidence as to the second element of

the mail fraud claim-Appellant's knowledge that the BAQ would be mailed to DWR's New York Office-is a closer call than with his U–4, this court has previously held in relation to this element of mail fraud that "the government does not have to show that the defendant actually intended to cause the mails to be used," but rather that "the mailing need only be closely related to the scheme and reasonably foreseeable as a result of the defendant's actions." *Frost*, 125 F.3d at 354 (quoting *United States v. Silvano*, 812 F.2d 754, 760 (1st Cir.1987)).

Because of this "reasonably foreseeable" standard, and because the evidence is to be viewed in the light most favorable to the prosecution, we find that a rational trier of fact could have found it reasonably foreseeable that a copy of the BAQs would be mailed to DWR's headquarters in New York, particularly when testimony established that Defendant was aware of the purpose that the annual BAQ served.

For these reasons, we hold that the government presented sufficient evidence for a rational trier of fact to convict Defendant of two counts of mail fraud and of one count of providing a false statement.

### IV.

■ Appellant next asserts that the district court erred in denying his motion for a new trial, arguing that the verdicts were against the great weight of the evidence. We review the district court's denial of a Fed.R.Crim.P. 33 motion for a new trial under an abuse of discretion standard. *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir.1988). Rule 33 states that "the [trial] court on motion of a defendant may grant a new trial if required in the interest of justice." Fed.R.Crim.P. 33. When considering a Rule 33 motion for a new trial based upon the weight of the evidence, district courts can "consider the

credibility of the witnesses and the weight of the evidence to insure that there is not a miscarriage of justice. It has often been said that the trial judge sits as a thirteenth juror." *United States v. Turner*, 490 F.Supp. 583, 593 (E.D.Mich.1979), *aff'd*, 633 F.2d 219 (6th Cir.1980). However, such motions "are not favored" and should only be granted "in the extraordinary circumstance where the evidence preponderates heavily against the verdict." *Id.* The role of the appellate court is "to examine the evidence to determine whether the district court's ruling was a clear and manifest abuse of discretion." *United States v. Hernandez*, 227 F.3d 686, 695 (6th Cir.2000)(quoting *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir.1998)).

Citing to specific evidence adduced at trial as support for each element of the crimes involved, the district court's memorandum provided detailed evidentiary justification for its denial of Defendant's motion. The Court of Appeals does not sit as a thirteenth juror to judge the credibility of witnesses or to reweigh the evidence, but instead reviews the entire record to determine whether the district court has abused its discretion. *Ashworth*, 836 F.2d at 266. We find no such abuse of discretion here.

### V.

■ Finally, Appellant claims that the district court violated his Sixth Amendment right of confrontation by refusing to allow him to further cross-examine Basile when Defendant called him as part of his case-in-chief. We review the district court's decision to limit Defendant's questioning of a witness for an abuse of discretion. *See Gen. Elec. v. Joiner*, 522 U.S. 136, 141, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

■ The Confrontation Clause of the Sixth Amendment guarantees a criminal

defendant the right to cross-examine witnesses against him. *See United States v. Lloyd,* 10 F.3d 1197, 1217 (6th Cir.1993). However, the Confrontation Clause limits this guarantee only to an opportunity for effective cross-examination, not unlimited cross-examination. *See id.* "Where a trial court has limited but not totally precluded cross-examination ... the issue is whether the jury was otherwise in possession of sufficient information concerning formative events to make a discriminating appraisal of a witness' motives and bias." *United States v. Touchstone,* 726 F.2d 1116, 1123 (6th Cir.1984). District courts have wide latitude to impose reasonable limits, based on considerations of prejudice, harassment, confusion, redundancy, and relevancy. *See Lloyd,* 10 F.3d at 1217.

■ At trial, the government called Basile on direct, Defendant cross-examined Basile thoroughly without interruption by the district court, and Basile was excused. Later, during Defendant's case-in-chief, Defendant called Basile to the stand, apparently as a witness for the defense. Defendant did not declare Basile a hostile witness, but began questioning Defendant with leading questions as though continuing to cross-examine Basile. After sustaining several government objections, the court called a recess and held a hearing to ascertain Defendant's intentions. Defendant claimed that since the time of his cross-examination of Basile, Defendant's civil attorney had brought some documentation to Defendant's attention which indicated that Basile did not run the "tight ship" that Basile had claimed during his direct examination by the government. Defendant wanted to cross-examine Basile based upon this documentation so as to impeach Basile's direct examination testimony. The district court refused to allow Defendant this "second bite of the apple," noting that Defendant had been privy to all of this documentation previously, that continuances had been granted so as to

allow counsel to become familiar with the voluminous record, and that Defendant had been allowed full cross-examination of Basile after direct. We agree with the district court's ruling.

While Appellant cites cases for the proposition that cross-examination should not be limited inasmuch as it is important for defense counsel to expose the facts to the jury, he fails to point to any authority which would allow him to re-open cross-examination based upon documents or information which he could have used during cross-examination. Moreover, Appellant has also failed to show, in light of the overwhelming evidence that he took measures to conceal his involvement with LEF securities dealings, how further cross-examination of Basile would have changed the trial's outcome. As the district court noted, neither DWR nor Basile were on trial in this matter and Defendant's attempt to exculpate himself by claiming that Basile ran a loose ship and turned a blind eye to Defendant's dealings so that DWR could profit does nothing to change the outcome on Defendant's guilty verdicts of mail fraud and making a false statement.

We find that Defendant's previous cross-examination provided him with the opportunity to question Basile such that the jury was in possession of the information that it needed to assess Basile's motives and bias. *Touchstone,* 726 F.2d at 1123. The district court did not overreach its wide degree of latitude when it found that resurrecting Defendant's cross-examination of Basile would be redundant.

VI.

Based on the foregoing, Appellant's convictions are AFFIRMED.